# HOUSTON AND TEXAS CENTRAL RAILWAY COMPANY *v.* TEXAS.

ERROR TO THE COURT OF CIVIL APPEALS FOR THE SECOND SUPREME JUDICIAL DISTRICT OF THE STATE OF TEXAS.

No. 406.  Argued January 24, 25, 1898. — Decided April 25, 1898.

In *Galveston, Harrisburg & San Antonio Railway Co.* v. *Texas, ante,* 226, the grants of land repealed by the operation of Section 6 of Article X of the constitution of Texas of 1869, were grants to aid in the construction of lines of railway not authorized until after that provision took effect; whereas, in this case, the grants which are claimed to be affected by it were grants made prior to the adoption of that constitution, for the purpose of aiding in the construction of the road from Brenham to Austin. *Held,* that that constitutional provision, as thus enforced, impairs the obligation of the contract between the State and the railway company, and cannot be sustained.

Argument was urged on behalf of defendant in error that the particular lands sued for are situated in what is known as the Pacific reservation, being a reservation for the benefit of the Texas and Pacific Railway Company, created by a special act of May 2, 1873, and hence, that though the certificates were valid, they were not located, as the law required, on unappropriated public domain.  This question was not determined by either of the appellate tribunals, but, on the contrary, their judgments rested distinctly on the invalidity of the certificates for reasons involving the disposition of Federal questions.  This court therefore declines to enter on an examination of the controversy now suggested on this point.

THIS was a suit instituted by the State of Texas in the District Court of Nolan County, Texas, February 3, 1890, to recover of the Houston and Texas Central Railway Company and the purchaser under it, sixteen sections of land of 640 acres each, located in that county by virtue of certificates issued by the State to the railway company.  It was alleged

that the certificates were issued by the commissioner of the general land office of Texas without authority of law, and that the action of the commissioner in issuing and delivering them and permitting them to be located and allowing the lands to be surveyed thereunder, and in receiving and filing the field notes in the general land office of the State, was without authority of law and in violation of the constitution and laws of the State at that time. And also that the certificates were located in territory reserved by an act passed May 2, 1873, for the location of certificates issued to the Texas and Pacific Railway Company. It appeared from the State's complaint that the certificates were a part of those issued for the construction and completion of about ninety-four miles of main track and about two and one half miles of side track of that part of the company's railway extending from Brenham to Austin.

The District Court gave judgment in favor of the State, which was affirmed by the Court of Civil Appeals. 36 S. W. Rep. 819. Application was made to the Supreme Court of the State for a writ of error, which was denied. 40 S. W. Rep. 402. This writ of error was then allowed.

The Galveston and Red River Railway Company was incorporated by a special act of the legislature of Texas, approved March 11, 1848. Special Laws, 1848, 370. By the second section of that act the company was "invested with the right of making, owning and maintaining a railway from such a point on Galveston Bay, or its contiguous waters, to such point upon the Red River, between the eastern boundary line of Texas' and Coffee's station, as the said company may deem most suitable, with the privilege of making, owning and maintaining such branches to the railway as they may deem expedient."

A special act supplementary to that act was approved February 14, 1852, c. 148, by section 14 of which there was granted to the company " eight sections of land of six hundred and forty acres each, for every mile of railway actually completed by them and ready for use; " and provision was made for the inspection of the road from time to time by the state

engineer, or a commissioner to be appointed by the Governor, as any section of five miles thereof should be completed, on whose certificate that said section had been completed in a good and substantial manner and ready for use, the comptroller should give information of that fact to the commissioner of the general land office, whose duty it should be to issue land certificates for the lands thus granted, which should be located upon the public domain of the State, survey be made, the field notes returned, and patents issued. Special Laws, 1852, 142.

By another special act of February 7, 1853, the preliminary action of the incorporators in commencing the survey and grade of the railway at the city of Houston was confirmed ; and by section two, the company was "further authorized and empowered to extend said railway to the city of Galveston, and also to make and construct simultaneously with the main railway, described in the original acts establishing said company, a branch thereof towards the city of Austin, under the same restrictions and stipulations provided in said original acts, etc." Special Laws, 1853, Extra Session, 36, 37.

January 30, 1854, the legislature passed a general law granting sixteen sections of land to the mile for constructed railroad, which is sufficiently set forth in the preceding case, as well as the supplementary act approved the same day. It was provided that companies accepting the provisions of the act and already entitled to eight sections per mile should not be entitled to receive any grant for branch roads.

January 23, 1856, the legislature passed a special act, c. 20, entitled "An act for the relief of the Galveston and Red River Railway Company, and supplementary to the several acts incorporating said company," by which, after providing that the company should have six months after January 30, 1856, to complete the first twenty-five miles of its road, commencing at the city of Houston, it was declared that "said company shall be entitled to the rights, benefits and privileges granted by an act approved January thirtieth, eighteen hundred and fifty-four, entitled 'An act to encourage the construction of railroads in Texas by donations of land,'

upon the completion of said twenty-five miles within said six months," etc., upon certain conditions, to wit: That the company should construct twenty-five miles of its road each year after the expiration of said time; that it should maintain its principal office and keep its records on the line of its road; that a majority of its directors should reside in the State; that it should build its main line to a certain point before commencing any branch road; that the act of February 7, 1853, to regulate railroads should apply to the charter; and that it should " yield all general branching privileges, except such as are expressly granted by the provisions of its charter to certain points, and shall be required to expend only so much of its capital stock upon any branch as shall be expressly subscribed to such branch, and shall not spend upon its trunk any moneys subscribed for any branch, and shall be required to complete its main trunk to the point on Red River contemplated in its charter, or to such point of intersection between said road and some other road running from the northern or eastern boundary of Texas towards El Paso, as shall be agreed upon between the directors of said company." It was provided that the company might assign certificates for lands granted it; that it might borrow money for the construction of the railway and secure the same by mortgage and the issue of bonds; and that it should have the right after location and survey of the lands granted it, or any part thereof, to mortgage or sell any part of the same. The sixth section read: " That nothing in this act shall be so construed as to affect the right of the State to repeal or modify the act of January 30, 1854, entitled ' An act to encourage the construction of railroads in Texas by donations of land;' provided, that the right to lands acquired before said repeal or modification shall in all cases be protected." Special Laws, 1856, 28, 30.

By another special act approved September 1, 1856, c. 351, the Galveston and Red River Railway Company was authorized to change its name to " The Houston and Texas Central Railway Company," and it was also provided that the failure of the company to build the second section of its road within

one year after the completion of the first section should not work a discontinuance as to said company of the benefits of the general act of January 30, 1854, or of any other general or special laws relative to railroads, "if said company shall have completed their second and third sections, amounting to at least fifty miles, at the expiration of two years after the construction of said first section." Special Laws, 1856, 259, 260.

By another special act passed February 4, 1858, c. 86, it was, among other things, provided that the failure of the company to complete the third section of its road by July 30, 1858, should not work a discontinuance as to the company of the benefits of the act of January 30, 1854, or any other general laws in reference to railroads, if the company should complete the third section by July 30, 1859, and that on the completion of subsequent sections of twenty-five miles annually after July 30, 1859, or fifty miles every two years, "said company shall be entitled to sixteen sections of land per mile, as contemplated in said last-mentioned act, for each section so completed;" and "that the benefits of the provisions in the general laws shall only inure to the said company while said laws shall remain in force." Special Laws, 1858, 94, 95.

By still another special act, approved February 8, 1861, c. 13, any failure to complete the fourth and fifth sections was condoned, and the company given until January 30, 1863, in which to complete those sections. Special Laws, 1861, 11, 12.

When the civil war began in 1861, the company had completed and had in operation its main line for about eighty miles from the terminus at Houston. January 11, 1862, the legislature passed two general acts, continuing in force all laws granting lands to railway companies and extending the time in which they were required to construct certain parts of their lines until two years after the close of the war. These acts provided that the president and directors of this railway company should, before the provisions of the acts might extend to the benefit of the company, pass a resolution restoring the original *bona fide* stockholders of the company to the rights, privileges and immunities to which they were entitled previous

to the sale of the road as mentioned in the acts, provided the stockholders should pay into the treasury of the company ten per cent upon their stock on or before the expiration of the extension of time provided, or otherwise should forfeit their rights, privileges and property interests as stockholders. Laws, 1862, c. 69, pp. 43, 44, 46, 47. The resolution required by these acts was duly passed by the company.

On September 21, 1866, a special act was passed, entitled "An act granting lands to the Houston and Texas Central Railway Company," by which a specific grant was made to that company "of sixteen sections of land, of six hundred and forty acres each, for every mile of road it has constructed, or may construct, and put in running order, 'in accordance with the provisions of the charter of said railroad company;'" provided that the lands theretofore received under the general act of January 30, 1854, should be deducted from the grant thus made, and that the certificates issued on the first three sections should "be included in the terms, benefits and conditions of this act as if issued by virtue of its provisions;" and that the company should construct and put in running order a section of twenty-five miles of additional road to that now built, within one year from January 1, 1867, or fifty miles within two years from that date; and that the road should be put in running order to Bryant's station by September 1, 1867. Provision was made for the inspection of the road from time to time as sections should be completed, and for the issue and location of certificates and the survey of the lands thereby granted. Special Laws, 1866, c. 10, pp. 33, 34.

November 13, 1866, a general law was passed whereby the grant of sixteen sections per mile under prior laws was continued for ten years from that date. Laws, 1866, c. 174, p. 212. This act also provided that "all tap roads over twenty-five miles long shall be entitled to the benefits of this act."

By the constitution of 1869, Art. 12, § 43, the statutes of limitation of civil suits were declared suspended by the act of secession of January 28, 1861, and to be considered as suspended until the acceptance of that constitution by Congress, which acceptance occurred March 30, 1870.

The Washington County Railroad Company was incorporated by a special act approved February 2, 1856, and was invested "with the right of locating, constructing, owning and maintaining a railway commencing at such point on the trunk of the Galveston and Red River Railroad as said corporation shall deem most suitable, crossing the Brazos River within the limits of Washington County, and then running by the most suitable and direct line to Brenham in said county." Special Laws, 1856, 49. This railroad company was organized and thereafter constructed and put in running order from a junction with the Houston and Texas Central Railway Company at Hempstead, thence directly towards the city of Austin to Brenham, a distance of twenty-five miles.

Some time prior to August 29, 1868, the Houston and Texas Central Railway Company purchased the Washington County Railroad at foreclosure sale. On that day the convention which had assembled to frame a new constitution, and which did frame the constitution adopted in 1869, passed an ordinance, reciting that the Houston and Texas Central Railway Company had become the owner, by purchase, of the Washington County Railroad; that both of said companies were indebted to the State for sums borrowed from the special school fund; and that the Houston and Texas Central Railway Company desired to extend the Washington County branch to the city of Austin as soon as it could be done, and to extend its main line to Red River; and it was declared "that the Washington County Railroad is hereby made and declared to be a branch of the Houston and Texas Central Railroad, and shall henceforth be known and called the 'Western Branch of the Houston and Texas Central Railway,' and shall be controlled and managed by said Houston and Texas Central Railway Company, and the Houston and Texas Central Railway Company shall have the right to extend said western branch of their road from the town of Brenham, in Washington County, to the city of Austin, in Travis County, by the most eligible route as near an air line as may be practicable."

The same convention also passed, December 23, 1868, a

"declaration for the relief of the Houston and Texas Central Railway Company," which provided that the company should not suffer "any forfeiture of any rights secured to it by existing laws by reason of the failure of said company to construct and put in running order their said railway to the town of Calvert, in Robertson County, by the first day of January, A.D. 1869, as required by the act of the 21st of September, A.D. 1866, provided said railway shall be constructed and put in good running order for the use of the public, to the said town of Calvert, by the first day of April, A.D. 1869."

The constitution framed by this convention was adopted by a vote of the people, at an election held November 30 to December 3, 1869, and was accepted by Congress March 30, 1870, 16 Stat. 80, c. 39. Section 6, article X, of that constitution, read as follows:

"The legislature shall not hereafter grant lands to any person or persons, nor shall any certificates for land be sold at the land office, except to actual settlers upon the same, and in lots not exceeding one hundred and sixty acres."

August 15, 1870, the legislature of Texas passed a special act entitled "An act for the relief of the Houston and Texas Central Railway Company," which recited substantially the same matters as were recited in the declaration of the convention, and provided in section 1 as follows:

"That the Washington County Railroad is hereby made and declared to be, to all intents and purposes in law, a part of the Houston and Texas Central Railway, and shall be under the control and management of the Houston and Texas Central Railway Company in like manner as every other part of said railway, and the Houston and Texas Central Railway Company shall have the right to build and extend the part of its railway heretofore known as the 'Washington County Railroad' from the town of Brenham, in the county of Washington, to the city of Austin, in the county of Travis, by the most eligible route to be selected by engineers of the company; and the said company shall also have the right to build a branch road diverging from the main trunk at some point in Navarro County and striking Red River at such point as will

enable such railway company to make a connection with any railroad which may be built to said river from the northward; and the said Houston and Texas Central Railway Company, by reason of the construction of said railway from the town of Brenham to the city of Austin, and by reason of the construction of said branch from Navarro County to Red River, shall have and enjoy all the rights, privileges, grants and benefits that are now, or may at any time hereafter, be secured to any railroad company in the State of Texas by any general law of the State, and shall be subject, in respect of said railway and said branch, to all the duties and responsibilities imposed upon the said Houston and Texas Central Railway Company by its charter and by other laws of the State."

Section 4 read thus:

"No forfeiture of any of the rights or privileges secured to it by existing laws shall be enforced against the said Houston and Texas Central Railway Company, by reason of its failure to comply with the conditions as to construction, imposed by the first section of the act of the twenty-first of September, A.D. 1866, entitled 'An act granting lands to the Houston and Texas Central Railway Company;' but the said company shall have and enjoy all the rights and privileges secured to it by existing laws, the same as if the conditions embraced in the first section of the said act of the twenty-first of September, A.D. 1866, had been, in all respects, complied with; provided that the land grant to said company shall cease, unless the said company shall complete their main trunk, east of the Brazos River, to Richland Creek, in Navarro County, within twelve months from the first day of October, A.D. 1870, and shall also complete their road to the city of Austin within two years after the passage of this act." Special Laws, 1870, 325.

The company completed its road to the city of Austin December 25, 1871, and completed its main line to Richland Creek, September 26, 1871.

Section 6 of article X of the constitution of 1869 was amended as of March 19, 1873, so as to authorize the legislature to grant lands for purposes of internal improvement. Thereupon the legislature of Texas passed many special laws

granting lands to railroads, and, afterward, on August 16, 1876, the legislature passed another general law granting sixteen sections of land per mile in aid of the construction of railroads. Laws, 1876, 153.

It appeared "that the defendants paid taxes on the lands sued for continuously since they were located and up to the present time," and "that the defendants paid all the fees of locating and surveying the said lands sued for, as well as for the same number of alternate sections known as the even numbers for the public free-school fund." Application for the inspection of the Austin line, as well as for the main line to Corsicana, was made by the company to the Governor February 9, 1872, which was done, and report showing the completion of the road made February 21, 1872. The certificates were issued in July of that year. The lands were placed on the maps of the general land office and always recognized as the company's land. They were all mortgaged by the company and sold on foreclosure in September, 1888.

*Mr. R. S. Lovett* for plaintiff in error. *Mr. James A. Baker* and *Mr. J. P. Blair* were with him on the brief.

*Mr. M. M. Crane*, attorney general of the State of Texas, for defendant in error.

MR. CHIEF JUSTICE FULLER, after stating the case, delivered the opinion of the court.

The Supreme Court of Texas held in *Galveston, Harrisburg & San Antonio Railway Company* v. *Texas*, 89 Texas, 340, that, conceding that section six of article ten of the constitution of 1869 did not repeal prior laws granting lands in aid of the defined lines of existing railroad companies, the section did operate to cut off the right to earn lands by the construction of lines not authorized until after the provision took effect. We have just considered that case, and expressed the opinion that the constitutional provision as thus enforced involved no infraction of the Constitution of the United States.

In the present case the state courts have decided that although the Houston and Texas Central Railway Company may have had the right under legislation prior to the adoption of the constitution of 1869 to construct a road from its main line to Austin and to earn lands by such construction, yet that the purchase by the company prior to 1869 of the Washington Railroad, running from Hempstead on the company's main line to Brenham in the direction of Austin, should not be treated as making that road part of the line the company was authorized to build; and that the extension from Brenham to Austin must be held to have been built as an independent line under the act of August 15, 1870, which, having been passed while the constitution of 1869 was in force, the company could not acquire any right to the land grant by the construction of road between the latter points. The question does not arise in respect of lands for the twenty-five miles from Hempstead to Brenham, but in respect of lands allowed as earned for the distance from Brenham to Austin, for which the certificates were duly issued, and were located; and which have always prior to this suit been recognized as lands of the company, and have been sold as such.

In other words, the state courts have applied to the road from Brenham to Austin the same rule laid down as to new lines authorized to be constructed, for the first time, after the constitution of 1869 was adopted. We cannot concur in this view, but, on the contrary, are of opinion that the constitutional provision as thus enforced impairs the obligation of the contract between the State and the company and cannot be sustained.

The Houston and Texas Central Railway Company, then styled the Galveston and Red River Railway Company, was authorized by its act of incorporation not only to construct the main line therein specified, but, by its second section, such branches as it should deem expedient; and by the fourteenth section of the special act of February 14, 1852, eight sections of land were granted to the company for every mile of railroad it should construct, no distinction being made between branch and main lines. By section 2 of the special act of

February 7, 1853, the company was empowered "to make and construct simultaneously with the main railway described in the original acts establishing said company, a branch thereof toward the city of Austin."

The general act of January 30, 1854, granted to all railroad companies constructing a section of twenty-five miles or more of railroad, sixteen sections of land for every mile of road so constructed and put in running order; though by section 12 it was provided that any company then entitled to a grant of eight sections of land per mile, which should accept the provisions of the act, should not be entitled to receive the grant thereby made for any branch road. This company was then entitled to eight sections per mile, but the special act of January 23, 1856, supplementary to the several acts incorporating the company, expressly extended the rights, benefits and privileges of the general act of January 30, 1854, to the company, subject to certain conditions not material to be enumerated, and with the limitation as to branch lines that the company should " yield all general branching privileges *except such as are expressly granted by the provisions of its charter to certain points*," and requiring it to spend on the branch only the money subscribed for the branch, and on the trunk only the money subscribed therefor.

By section two of the original act of incorporation general branching privileges had been conferred, and by section two of the special act of February 7, 1853, express authority to construct a branch to the city of Austin. It would seem plain then that section five of the act of January 23, 1856, distinctly referred to the right to construct this particular branch, and so preserved it that the benefits of the act of January 30, 1854, were extended to that branch and its construction, and no other. In other words, all branching privileges except for the Austin line were yielded in accepting the benefits of the act of 1854, but as to that expressly authorized branch the right to construct it was preserved with the benefits accorded to its construction. The act of February 4, 1858, repeated the assurance of the benefits of the act of 1854.

But it is said that by the sixth section of the act of 1856

the right to repeal or modify the act of 1854 was reserved, and that by the second section of the act of 1858 the benefits of any general law inured only so long as such law remained in force. Rights to lands acquired before such repeal or modification would not, however, be affected thereby, nor is it important to specially discuss the operation of the constitution of 1869 in this regard, as the special act of September 21, 1866, made a specific grant to the company of "sixteen sections of land of six hundred and forty acres each of every mile of road it has constructed or may construct and put in running order in accordance with the provisions of the charter of said company." We think that this plainly applied to the construction of the Austin line as well as the main line of the company. It applied to all lines constructed by the company in accordance with the provisions of its charter. And the right to construct the Austin line had been specifically conferred by the special act of February 7, 1853. The general branching privileges which the company possessed under its original act of incorporation it had been required to surrender by the act of 1856, except such as were "expressly granted by the provisions of its charter to certain points," and Austin was a point to which the company was expressly authorized to build. So that the Austin branch was one of the lines covered by the charter when the act of September 21, 1866, was passed, and the grant thereby made applied to it. And there was no reservation of a right to repeal or modify the act.

This legislation secured the construction of the branch to Austin, the capital of the State, an obvious necessity, and especially as that important point was then without any line of railway whatever.

Counsel for the State contended that the act granted lands for the construction only of the main line and not of the Austin line. The last clause of the third section of the act was: "And said railroad company shall construct their road in the line heretofore prescribed by 'An act for the relief of the Houston and Texas Central Railway Company,' approved February the 8th, 1861."

The line defined in the act referred to was : " *Provided*, said railroad shall run on the nearest and most practicable route from its line at or near Horn Hill to Dresden, in Navarro County, and thence to the town of Dallas, or within one and a half miles of said town, and thence to the terminus of the Red River, within fifteen miles of Preston." Special Laws, 1861, 11.

This fixed the route of the main line by Dresden and Dallas to the vicinity of Preston instead of Coffee's station. The route of the Austin line had been provided for by the act of February 7, 1853, and there was evidently no occasion to change it.

But it does not follow that because of this definition of the main line in the third section the grant in the first section of the act of September 21, 1866, should be confined to that line.

The company already had a grant of sixteen sections per mile for its main line under the general act of January 30, 1854, and there was no controversy over that, nor any need of further legislation in that regard when this act was passed. As to the branch line there might be dispute, and, furthermore, the right to repeal the grant was reserved in the acts of January, 1856, and February, 1858; and it may well be assumed that the object of the act of September 21, 1866, was to remove any doubt on the subject of the grant for the Austin line and remove the danger of a possible repeal. We are the more constrained to this conclusion by the language of the subsequent general act of November 13, 1866, "that all tap roads over 25 miles long shall be entitled to the benefits of this act," which modified the policy as to branch roads indicated in the act of 1854.

We find then that the company was granted by the State prior to the adoption of the constitution of 1869, sixteen sections of land per mile for the construction of the Austin line by the special act of January 23, 1856, and by the special act of September 21, 1866. And the rights of the company to the lands granted were preserved by extensions of time; as occasion required, within which to comply with conditions respecting the rate of construction. By the act of September 1, 1856,

the failure of the company to complete the second section of its road within one year after the completion of the first section was waived; again by the act of February 4, 1858, the company was granted further time in which to complete construction; again by the act of February 8, 1861, it was given until January 30, 1863, to perform the work required of it; and during the war the laws of January 11, 1862, were passed extending the time until two years after the close of the war on the condition that the extension should inure to the benefit of the company only in the event that it should restore the rights of the stockholders which had been foreclosed, which condition was complied with by the company; after this further time was given by the act of September 21, 1866; again by the act of November 13, 1866; and again by the ordinance of December 23, 1868; and finally by section four of the special act of August 15, 1870.

Before the constitution of 1869 was adopted, the company had acquired the Washington County Railroad, and the convention which framed that instrument on August 29, 1868, ratified and confirmed the purchase of that road, and declared that the Washington County Railroad was thereby made and declared to be a branch of the Houston and Texas Central Railroad, to be controlled and managed by the Houston and Texas Central Railway Company, with the right to extend the road from Brenham to Austin by the most eligible route.

The company had completed and had in operation five sections of twenty-five miles each of its main line, and by the acquisition of the Washington County Railroad, had in operation that part of the Austin branch extending from the junction of the main line at Hempstead to Brenham directly toward Austin.

Thus it is seen that the company had been granted sixteen sections of land per mile for the construction of the Austin branch as well as the main line; that it had accepted the grant; and had commenced to earn it, and had actually acquired the right to earn it, by the construction of an important part of the line which the State by the grant intended to promote, before the adoption or acceptance of the constitution of

1869. The company had not merely organized and commenced the work it was incorporated to carry on, but had completed a large part of it. It had completed one hundred and twenty-five miles of main line prior to June 15, 1869, and manifestly had much more in process of construction, for it appears from the record that several additional sections were completed and put in operation soon after that date. It had also acquired and had in operation that part of the Austin branch extending from the junction at Hempstead to Brenham, a distance of twenty-five miles, originally constructed by the Washington County Railroad Company and afterwards purchased by this company.

We do not understand the state courts to have decided that the purchase of the Washington County road was *ultra vires*, but to have held that the construction of the line from Brenham to Austin was an independent enterprise authorized for the first time by the act of August 15, 1870, and being a new and additional line no land grant could be claimed for it because the constitutional provision was then in force.

In our opinion, however, if the Washington County road was lawfully acquired by the Houston and Texas Central Railway in 1868, it became as much a part of the Austin branch as if it had been constructed by the company, and its subsequent completion to Austin placed that part of the line from Brenham to Austin in the same situation as if the entire line from Hempstead to Austin had been in fact so constructed. And this would have been so if the company had built ninety-five miles from Hempstead towards Austin, and then lawfully obtained twenty-five miles of existing road to complete the branch. Of course the company was not entitled to a land grant for the twenty-five miles from Hempstead to Brenham, nor is any such claim made, but that twenty-five miles became by the purchase a part of the branch with like effect as if originally part of it, and to treat the completion of the branch as a new and independent enterprise we cannot but regard as inadmissible in view of the facts. For this twenty-five miles had been purchased; was controlled and operated; and existed as a part of the company's Austin branch in fact.

The Houston Company and the Washington Company were both endowed with the capacity to make contracts, and generally to do and perform all such acts as might be necessary and proper for or incident to the fulfilment of their obligations. Act, Mar. 11, 1848, § 1, Spec. Laws, 1848, 370; Act, Feb. 2, 1856, § 2, Spec. Laws, 1856, 49. They were both required to afford the public the advantages of a continuous line. Act of Feb. 14, 1852, § 9, Spec. Laws, 1852, 142; Act of Feb. 2, 1856, § 12, Spec. Laws, 1856, 49. The acquisition of the Washington road was in accomplishment of the object of securing a line to the capital, and was not in contravention of the general intention of the legislature. The ordinances of the convention in terms ratified the transaction and reiterated the previous authority to extend to Austin. These ordinances are part of the history of the case, and reference to them in connection with the alleged scope of the particular provision of the constitution framed by that convention and submitted to the vote of the people may not improperly be made. In *Quinlan* v. *Houston &c. Railway Co.*, 89 Texas, 356, it was held that a convention called to frame a constitution to be submitted to a popular vote cannot pass ordinances and give them validity without submitting them to the people for ratification as part of the constitution.

These ordinances were not so submitted, and we are not called on to express any opinion as to whether in view of the anomalous circumstances under which this particular convention met; the previous decisions of the Supreme Court of the State; or any other considerations, they, or either of them, could be regarded as valid.

For irrespective of that, the act of August 15, 1870, expressly recognized and ratified the purchase of the Washington railroad and the State could not deny the validity of that which it had expressly validated, if otherwise open to question.

In *Galveston Railroad* v. *Cowdrey*, 11 Wall. 459, referring to a mortgage executed by a railroad company in Texas when there was no statute of that State expressly authorizing railroad companies to mortgage their roads as such, Mr. Justice Bradley, speaking for this court, said: "Without examining

how far the operative effect of a mortgage executed by a railroad company upon its road, works and franchises may extend, *per se*, without statutory aid, it is sufficient to say that, in our opinion, the legislature of Texas has validated the mortgages, and given them the effect which, by their terms, they were intended to have."

It appears to us that this purchase comes within the rule thus expressed, and that if there had originally been objection it was technical merely and removed by the act of 1870.

Now the latter act authorized no new line nor made any new grant of lands to which, no previous right existed, nor restored lands which had been forfeited. If ground of forfeiture had accrued by reason of failure to complete as rapidly as required, it had not been enforced, and if outstanding was waived by the act.

If there had been a failure to construct in time so that a forfeiture would have been justified, no such forfeiture was declared by any judicial proceeding, or by any legislative action equivalent to office found. *St. Louis, Iron Mountain &c. Railway v. McGee*, 115 U. S. 469; *Bybee v. Oregon & California Railroad*, 139 U. S. 663; *Galveston, Harrisburg &c. Railway v. State*, 81 Texas, 572.

And the executive officers of the State, charged with the administration of the laws granting lands to railroads, and vested with jurisdiction to determine the facts, had ascertained and determined the facts here, and issued the certificates because in their judgment the road had been completed in accordance with the law.

No argument was made that any ground of forfeiture could be availed of in the case, nor was any such point ruled by the Court of Civil Appeals, or by the Supreme Court.

The judgment of the Court of Civil Appeals may have been rested in part on the view that the constitution of 1869 repealed all laws granting lands to railroad companies regardless of the acceptance of such laws and the construction of the lines of road thereunder.

The Supreme Court proceeded on the ground that the road from Brenham to Austin was not authorized until after 1869

and fell into the category of a new line, and therefore the company had no right to the land grant.

From what we have said it will be perceived that we are unable to accede to either of these propositions.

In our opinion it results from the legislation and the facts that the company had the right to construct the line to Austin and earn sixteen sections per mile by so doing, prior to 1869; that by the acceptance of its charter and the subsequent legislation, and by the completion of an important part of its road before the adoption of the constitution of 1869, the company had acquired a vested right to the land grant; that the purchase of the Washington County road must be regarded as valid, and that thereby that road became part of the Austin line in operation as such before 1869; that the extension of the branch from Brenham to Austin cannot properly be treated as a new and independent line, and that there therefore was a contract between the State and the company in respect of lands earned by the construction thereof.

It follows that section 6 of Article X of the constitution of Texas as given effect by the state courts impairs the obligation of the contract and deprives the company of its property without due process of law.

Argument was also urged on behalf of defendant in error that the particular lands sued for are situated in what is known as the Pacific reservation, being a reservation for the benefit of the Texas and Pacific Railway Company, created by a special act of May 2, 1873, and hence, that though the certificates were valid, they were not located, as the law required, on unappropriated public domain.

This question was not determined by either of the appellate tribunals, but, on the contrary, their judgments rested distinctly on the invalidity of the certificates for reasons involving the disposition of Federal questions. We must decline to enter on an examination of the controversy now suggested on this point.

*The judgment is reversed and the cause remanded for further proceedings not inconsistent with this opinion.*