*GARRETT v. AMERICAN BAPTIST HOME MISSION SOCIETY et al.

No. 886.   Opinion Filed July 11, 1911.

(116 Pac. 921.)

INDIANS—Erection of Educational Buildings—Vested Rights.   A relig-
ious society complied with the provisions of article 13 of the
treaty of the United States with the Creek Tribe of Indians (14
U. S. Stat. at L. p. 790) by obtaining from the tribal authorities
consent to erect buildings for educational purposes within the
Creek country, and by erecting said buildings and selecting 157.12
acres of land so as to include said improvements, and has con-
tinuously maintained thereon an institution for the education of
Creek Indians.   Held, that the society thereby became vested, un-
der the provisions of said treaty, with such title and vested right
in the lands selected that it could not be deprived thereof by
section 24 of the agreement with the Creek Indians, approved
March 1, 1901, c. 676, 31 Stat. 868, which attempts to provide that
all of said lands selected by the society, except 40 acres, shall
be subject to allotment by members of the tribe.

(Syllabus by the Court.)

*Error from District Court, Muskogee County; John H. King, Judge.*

Suit by the American Baptist Home Mission Society against Quentin Garrett and others.   Judgment for plaintiff, and Garrett brings error.   Affirmed.

*Benj. Martin, Jr.,* and *De Roos Bailey,* for plaintiff in error.

*William T. Hutchings,* for defendants in error.

HAYES, J.   This action was commenced in the United States Court for the Northern District of the Indian Territory by the American Baptist Home Mission Society, one of the defend-

---

*Appealed to the Supreme Court of the United States.

ants in error, to enjoin the members of the Commission to the Five Civilized Tribes from allotting certain lands in the Creek Nation to any member whomsoever, and to enjoin the Creek Nation from executing and delivering deeds to said lands, and to cancel certain allotment certificates theretofore issued by said Commission to other defendants, and to have the title to said lands quieted in plaintiff. Upon the admission of the state, the cause was transferred to the district court of Muskogee county, under the provisions of the Enabling Act and the Schedule to the Constitution, where a trial was had to the court upon an agreed statement of facts, and judgment was rendered, granting to plaintiff below the relief prayed for in its petition. From that judgment, plaintiff in error, one of the defendants below, has prosecuted this appeal, and has made plaintiff below and all his codefendants below, who have refused to appeal, defendants in error herein.

Since the contest in this court is primarily between plaintiff in error and the American Baptist Home Mission Society, we shall hereafter refer to them, respectively, as plaintiff in error and as the society, and shall state in substance those facts bearing directly upon the contest between them, and omit such facts as were peculiarly applicable to the contest in the court below between the society and the other defendants in error.

It is agreed that the society is a corporation, organized under the laws of the state of New York for missionary and educational purposes; that it has been so engaged in the Creek Nation continuously since the year 1880. The society claims its right and title to the 157.12 acres of land situated in the Creek Nation, particularly described in its complaint and of which the land in controversy between it and plaintiff in error is a part, under and by virtue of the provisions of the treaty of the United States with the Creek Tribe of Indians, ratified on July 19, 1866. The thirteenth article of that treaty reads as follows:

"A quantity of land not exceeding one hundred and sixty acres, to be selected according to legal subdivisions, in one body, and to include their improvements, is hereby granted to every religious society or denomination which has erected, or which, with the consent of the Indians, may hereafter erect buildings

within the Creek country for missionary or educational purposes; but no land thus granted nor the buildings which have been or may be erected thereon shall ever be sold or otherwise disposed of, except with the consent and approval of the Secretary of the Interior; and whenever any such lands or buildings shall be so sold or disposed of, the proceeds thereof shall be applied, under the direction of the Secretary of the Interior, to the support and maintenance of other similar establishments for the benefit of the Creeks and such other persons as may be or may hereafter become members of the tribe according to its laws, customs, and usages; and if at any time said improvements shall be abandoned for one year for missionary or educational purposes, all the rights herein granted for missionary and educational purposes shall revert to the said Creek Nation." (14 U. S. Stat. at L. p. 790.)

After the society became engaged in missionary and educational work in the Creek Nation, the National Council of the Creek Nation passed an act which in part reads as follows:

"Be it enacted by the National Council of the Muskogee Nation, that permission is hereby granted to the American Baptist Home Mission Society, through the Board of Trustees hereinafter named, and to their successors, to found, establish and maintain within the limits of the Creek Nation and under the protection of the laws thereof, an Indian university, that shall be to the Indian Territory, as nearly as practicable, all that state universities are to the several states in which they are located, and shall be open to the reception of students from the citizens of the Creek Nation, and other Indian tribes or nations. There is also hereby granted to said university the free use of only such an amount of land as shall be needed for the carrying out of its general plans and purposes: Provided, that whenever the said land shall cease to be used, it shall revert to the Creek Nation." (Page 75 of the 1893 edition, Constitution and Laws of Muskogee Nation.)

Soon after the passage of the foregoing act by the tribal council, the society inclosed with a substantial wire fence the 157.12 acres described in its petition, of which the land in controversy between it and plaintiff in error is a part. Upon 40 acres of this 157.12-acre tract, the society constructed a brick building at a cost of $14,000, and completed same ready for occupancy during the year 1887, and has continuously used and oc-

cupied the same since that time for missionary and educational purposes, and has since that date constructed thereon other small buildings, consisting of stables, outhouses, etc., and the remainder of the land, of which the tract here in controversy is a part, has been used by the society in connection with its institution for agricultural, grazing, and meadow purposes.

Section 24 of the Agreement with the Creek Tribe of Indians, approved March 1, 1901, provides:

"The following lands shall be reserved from the general allotment herein provided for: * * * The lands occupied by the university established by the American Baptist Home Mission Society, and located near the town of Muskogee, to the amount of forty acres, which shall be appraised, excluding improvements thereon, and said university shall have the right to purchase the same by paying one-half the appraised value thereof, on terms and conditions herein provided. All improvements made by said university on lands in excess of said forty acres shall be appraised and the value thereof paid to it by the person to whom such lands may be allotted." (Chapter 676, 31 Stat. 868.)

The Commission to the Five Civilized Tribes never notified the society, under the above provision of the treaty, to select any particular 40 acres, but permitted persons entitled to allotment in the Creek Nation to allot on said land in possession of the society, except the 40 acres upon which its buildings are immediately located. The society never designated any particular 40 acres which, under the foregoing treaty, it desired to hold, but, on the contrary, notified the Commission to the Five Civilized Tribes that it would not do so, and for the Commission not to permit any person to file upon any part of the 157.12 acres claimed by it. Two of the society's codefendants were permitted by the Commission to file upon a portion of said land, and plaintiff in error, a minor, on the 7th day of January, 1906, acting through his father, applied to the Commission to have allotted to him a portion thereof, and said application is now pending before the Commissioner to the Five Civilized Tribes, not yet acted upon. It is admitted that plaintiff in error is a member of the Creek Tribe of Indians, and entitled to take an allotment in the Creek Nation.

Section 3 of the Creek treaty of 1901 provides that all lands of the Creek Tribe, except as otherwise provided in the treaty, shall be allotted among the citizens of the tribe. It is the contention of plaintiff in error that the effect of said section 3 and section 24 of said treaty is to make subject to allotment all the lands theretofore held by the society, except 40 acres, and entitles him to allot any portion thereof, upon payment to the society the appraised value of the improvements thereon. We think it clear, from the language of the said sections 3 and 24, that it was intended to make all the lands theretofore held by the society, except 40 acres, subject to allotment; but the society contends that it had acquired such title and vested right under the provisions of the treaty of 1866; that it was without the power of Congress to make said land subject to allotment, as it has attempted to do by the treaty of 1901, because it thereby attempts to deprive the society of its property without due process of law, in violation of the fifth amendment to the federal Constitution.

We concur in the views of the trial court that there is merit in the society's contention. The thirteenth article of the treaty of 1866, *supra,* has in contemplation two classes of grantees. The first consists of those societies or denominations that had, prior to the adoption of the treaty, erected buildings in the Creek country for missionary and educational purposes; and the second those societies or denominations that might thereafter, with the consent of the Indians, erect such buildings for said purposes in the Creek country. As to the first class of grantees, all that was required, in order for the grant to attach to a specific tract of land and convey title thereto to the grantee, was for such society to make selection of said tract, not to exceed 160 acres, so as to include its improvements. The second class of grantees had first to procure the consent of the Indians to construct buildings and improvements for missionary and educational purposes, and then select the tract of land it desired, not exceeding 160 acres, so as to include the improvements erected by it. The granting clause of this treaty, unaffected by any other provisions of the treaty, has been too often construed by the courts in fed-

eral acts, granting public lands, to require construction at this time, or to admit of doubt as to its meaning.

In *Leavenworth, etc., R. R. Co. v. United States,* 92 U. S. 733, 23 L. Ed. 634, the court had under consideration the granting clause of an act of Congress (Act March 3, 1863, c. 98, 12 Stat. 772), which reads as follows: "That there be and is hereby granted to the state of Kansas for the purpose of aiding in the construction.  *  *  * " Then follows a description of the railroads and telegraph lines to aid the construction of which the land was granted, and then a description of the land granted, in the following language:

"Every alternate section of land, designated by odd numbers for ten sections in width on each side of said road and each of its branches.  But in case it shall appear that the United States have, when the lines or routes of said road and branches are definitely fixed, sold any section, or any part thereto granted, as aforesaid, or that the right of pre-emption or homestead settlement has attached to the same, or that the same has been reserved by the United States for any purpose whatever, then it shall be the duty of the Secretary of the Interior to cause to be selected, for the purpose aforesaid, from the public lands of the United States.  *  *  * "

Then follows a provision for the selection of other lands in lieu of said lands reserved and sold prior to the location of the road.

Discussing the effect of the terms of this grant, the court said:

"It creates an immediate interest, and does not indicate a purpose to give in future. 'There be and is hereby granted' are words of absolute donation, and import a grant *in praesenti.* This court has held that they can have no other meaning; and the land department, on this interpretation of them, has uniformly administered every previous similar grant.  (Citing authorities.) They vest a present title in the state of Kansas, though a survey of the lands and a location of the road are necessary to give precision to it, and attach it to any particular tract.  The grant then becomes certain, and by relation has the same effect upon the selected parcels as if it had specifically described them. In other words, the grant was a float until the line of the road should be definitely fixed."

Discussing a similar statute, it was said, in *St. Paul &* *Pacific v. Northern Pacific,* 139 U. S. 1, 11 Sup. Ct. 389, 35 L. Ed. 77:

"The route not being at the time determined, the grant was in the nature of a float, and the title did not attach to any specific sections until they were capable of identification; but when once identified the title attached to them as of the date of the grant, except as to such sections as were specifically reserved. It is in this sense that the grant is termed one *in praesenti;* that is to say, it is of that character as to all lands within the terms of the grant, and not reserved from it at the time of the definite location of the route."

The granting terms of the treaty here involved are, "A grant of land not exceeding 160 acres, * * * is hereby granted," and we find other language in the treaty that indicates that it was the intention of Congress and the tribe to grant nothing less than the title to the land under the conditions and limitations expressed in the treaty, which are that if the improvements made by any such grantee shall be abandoned for one year for missionary or educational purposes, then all right under the grant shall revert to the Creek Nation, and a prohibition against sale of the property, except with the approval of the Secretary of the Interior, and with the condition that when it is sold the funds derived therefrom shall be applied to the support and maintenance of other similar establishments of the Creek Nation. In the terms of these conditions attached to the grant is, we think, evidence of intention of the parties to the treaty to grant to the grantees therein title to the lands they selected; for the language of one of these conditions is, "but no land *thus granted,* nor the buildings which have been or may be erected thereon, shall ever be sold or disposed of, except. * * *"
If it had not been the intention of the lawmakers to make a grant of the land to the societies specified in the treaty, there would have been no necessity of reserving the power of sale of such lands from the grantees therein; for it would have been a legal impossibility for them to convey that which they had never received. The lawmakers, we think, understood that they were granting away the land to these societies; and, in order

to insure that the land should be devoted to the purpose of the grant, limitation upon the power of sale of not only the buildings placed upon the land, but of the land itself, and the conditions of forfeiture, if the improvements ceased to be used for one year for missionary or educational purposes, were inserted in the treaty. The restraint upon the grantees against the sale or alienation of the lands granted, except with the approval of the Secretary of the Interior, and that the proceeds therefrom should be used for a certain purpose, did not prevent title from passing to the grantees. *St. Paul & Pacific v. Northern Pacific, supra.*

It was not only the purpose of the lawmakers to make sure that the rights and property of the Indians granted by the treaty should be forever used for the purposes named in the treaty, and to make it impossible for the grantees therein to divert it to other purposes, but also to protect those societies engaged in the laudable purpose of promoting the civilization and the educational and religious welfare of the Indians in the investments of their funds in improvements in the way of buildings for educational and missionary work among them. When the society in the instant case complied with the provisions of the treaty by obtaining consent from the Creek Nation to erect its buildings and by erecting such buildings, by making selection of the land, including its improvements, the general floating grant of the treaty to such societies became at that time attached to the specific land selected and passed to the society title thereto, of which it cannot be divested without due process of law. *Houston & Texas Cent. Ry. v. Texas,* 170 U. S. 243, 18 Sup. Ct. 610, 42 L. Ed. 1023; *Reichart v. Felps,* 6 Wall. 160, 18 L. Ed. 849; *Strother v. Lucas,* 12 Pet. 410, 9 L. Ed. 1137.

It is contended by plaintiff in error that because some of the lands selected by the society have not had placed upon them buildings, and have been used only for grazing, meadow, and agricultural purposes by the society, the society has no right thereto. But we think this contention without merit. There is nothing in the treaty of 1866 that requires that the entire land grant-

ed thereby to each society shall be occupied by buildings, or other improvements of such society, every moment from its selection. Article 13 of said treaty, *supra,* does not provide that only so much land as may be necessary for building purposes is granted, but it provides a quantity of land "not exceeding 160 acres," and the phrase, "for missionary or educational purposes," does not follow so closely after the words of grant as to indicate that it was the legislative intent that only so much of 160 acres should be granted as was absolutely essential to the construction of the buildings and improvements of such institution. On the other hand, said phrase is used in immediate connection with the words "building within the Creek country," for the purpose of defining the character of buildings, the construction of which would entitle the society or denomination to the benefits of the grant. It was left within the discretion of the society to select such a grant of land, not to exceed 160 acres, as within its judgment would best subserve the purposes, present and future, of its institution; and the fact that the society has used a portion of the land selected in connection with the institution for grazing and agricultural purposes does not constitute a violation of the grant. It is true that the act of the tribal council, by which permission is given to the society to found and establish its institution, consists of two clauses, by one of which said consent is given, and the other of which reads as follows:

"There is also hereby granted to said university the free use of only such an amount of land as shall be needed for carrying out of its general plans and purposes: Provided, that whenever the said land shall cease to be used, it shall revert to the Creek Nation."

Whether it was intended by this language to accomplish anything further than to express a full acquiescence and consent for the society to establish its institution and receive the full benefit of the grant under the treaty of 1866, or it was intended to limit and modify the terms of the grant under the treaty of 1866, it is unnecessary here to determine; for, if the latter purpose was intended by the tribal authorities, they transcended their power. Treaties and laws passed by Congress in pursuance of the Con-

stitution are the supreme law of the land; and Indian tribes are without power, without the consent of Congress, to modify or repeal acts of Congress. No contention is here made that the first clause of the tribal act did not grant to the society consent to found and to establish its institution within the limits of the Creek Nation; nor is such grant of consent conditioned upon the terms of the subsequent clause, which attempts to grant the free use of land.

This land has been in the possession of the society for a quarter of a century, during which time it has maintained an institution of education for the benefit of the Indians, and is now maintaining same. No proceeding has ever been brought by the federal government or by the tribe to declare a forfeiture, because of, noncompliance with the terms of the grant by the society; nor is any one complaining in this proceeding, except plaintiff in error, although defendants in the action in the court below include officers of the federal government of that department which has charge and supervision of the Indian tribes and of their lands, against whom judgment was rendered in the court below, and of which they are not complaining here.

The judgment of the trial court is affirmed.

All the Justices concur.