George **PERMANN**, Plaintiff and Respondent,

v.

**KNIFE RIVER COAL MINING CO.,**
Defendant and Respondent,

and

**The State of North Dakota, by and through its Board of University and School Lands, Defendant and Appellant.**

Civ. No. 8517.

Supreme Court of North Dakota.

Sept. 24, 1970.

Helgi Johanneson, Atty. Gen., John E.
Adams, Asst. Atty. Gen. and Lynn E.

Erickson, Special Asst. Atty. Gen., Bismarck, for defendant and appellant State of North Dakota, by and through its Board of University and School Lands.

Floyd B. Sperry, Bismarck, and Harvey J. Miller, Dickinson, for plaintiff and respondent, George Permann.

Pearce, Engebretson, Anderson & Schmidt, Bismarck, for defendant and respondent, Knife River Coal Mining Co.

KNUDSON, Judge.

Permann brought this action to restrain the Knife River Coal Mining Co. (hereinafter designated Knife River) from maintaining an electric transmission line upon the Northwest Quarter of Section 12, Township 143, Range 88, in Mercer County, North Dakota, on the ground that the original easement holder, the Oliver-Mercer Electric Cooperative, had, on April 17, 1963, permanently discontinued the operation of the power line prior to the assignment by the Cooperative to Knife River on May 6, 1963, of such easement; and that the power line interfered with the operation of the personal airport on said land, contrary to law. Knife River answered, alleging that the easement was a valid and subsisting easement and specifically denying that Permann had any right to an unobstructed approach to the airport as a flight path for aircraft. Knife River also counterclaimed, alleging that Permann was the purchaser under contracts of the Northwest Quarter and the Northeast Quarter of Section 12 from the State of NorthDakota, acting by and through the Board of University and School Lands of the State of North Dakota (hereinafter designated the State), wherein the State reserved fifty per cent of all minerals, including coal, in said land; and that on November 25, 1959, the State granted to Knife River a coal mining lease to the North Half of Section 12, Township 143, Range 88, Mercer County, North Dakota; and prayed that a partition of the coal between Permann and Knife River be

made, and that the State be made a party to this action. The court, on April 22, 1966, ordered that the State be made a party defendant pursuant to Rule 19(a) of the North Dakota Rules of Civil Procedure.

Permann replied to the counterclaim of Knife River in substance as follows: Permann admits that he purchased, under separate contracts, from the State, the Northwest Quarter and the Northeast Quarter of Section 12, Township 143, Range 88; admits that the State attempted to reserve in said contract fifty per cent of all minerals in said land; denies that the contract reserved to the State any coal; admits that the State executed a coal mining lease to Knife River dated November 25, 1959, to all of the coal in the North Half of Section 12; alleges that said lease is void and of no effect for the reason that the State did not own any of the minerals or the coal in said premises, and that said reservation is void; and that said lease would not give the lessee the right to maintain a power line over said premises; and prays that Knife River's counterclaim be dismissed.

The State answered the complaint of Permann, and counterclaimed against Permann, praying the court to void and annul all purported easements, sales, contracts and patents purporting to affect the premises here concerned; and the State cross-claimed against the counterclaim of Knife River.

On April 20, 1966, two days before the State was made a defendant, Permann personally appeared at the office of the State Land Commissioner in Bismarck and paid the balance due on the contract for the purchase of the Northwest Quarter; and on April 26, 1966, a patent was mailed Permann. The patent was signed and in statutory form, but contained the following reservation:

* * * reserving and excepting from the operation of this grant all rights and privileges vested in the state of North

Dakota under the provisions of the Constitution and laws of said state, including but not limited to 50% of all oil, or natural gas and other minerals which may be found on or underlying such land. *Both parties hereto specifically intend that the word "minerals" as used in this reservation include such clay, coal and uranium as were included within the meaning of that term prior to July 1, 1955.* [Emphasis added.]

Permann objected to the reservation of the coal in the patent, refused to accept its delivery, and deposited the patent with the clerk of the district court, claiming the reservation of the coal constituted an attempt to alter the terms of the written contract of purchase.

Permann amended his pleadings and prayed that title be quieted in him, claiming that the fifty per cent mineral reservation by the State in the contract did not include a reservation of lignite coal, and contends that coal, as such, is not a mineral and is not included in this reservation.

The case was tried by the court, sitting without a jury, on October 13, 1966. The court ordered judgment in favor of Permann, quieting title in him to the North Half of Section 12, Township 143, Range 88, except the mineral reservation of fifty per cent to the State, not including coal, and except the power line right-of-way easement assigned to Knife River; and subject to the vendor's lien in favor of the State for the balance due it under its contract with Permann for the purchase of the Northeast Quarter of Section 12.

Permann's pleadings were amended to conform with the relief granted, and to include therein the Northeast Quarter of Section 12, Township 143, Range 88. Judgment was entered accordingly.

The State appealed from the judgment, assigning twenty-nine specifications of errors of law appearing on the judgment roll, and asserted it would not furnish a settled statement of the case. The notice of appeal, specifications of error, and the State's brief were filed in the office of the Mercer County clerk of court on May 6, 1968, a few days prior to the expiration of the appeal period.

On May 10, 1968, a few days after the expiration of the appeal period, the State applied for an extension of time within which to settle the statement of the case. On October 8, 1968, the court settled the statement of the case with a demand for trial de novo incorporated therein.

We are at the outset faced with a motion by Permann to quash the settlement of the statement of the case and the demand for trial de novo on several grounds, which may be reduced to two main propositions: (1) That the State had made an absolute election to appeal on the judgment alone and not to demand a trial de novo in the Supreme Court and not to furnish a settled statement of the case; and (2) that the State, in moving for a settled statement of the case and in making a demand for trial de novo, did not do so for its own benefit but did so at the request of and for the benefit of Knife River, and had not shown for and in its own behalf the following required elements: (a) good cause; (b) diligence; (c) the inducing cause of failure to take steps within the time limited by law; and (d) that the granting of such extension would not operate to delay the hearing of appeal, without the delay being satisfactorily accounted for by appellant.

The judgment in this case was entered on November 6, 1967, and on November 8, 1967, service of the notice of entry of judgment on the defendant was made by mail by appellant.

The notice of appeal by the State, dated April 30, 1968, the specifications of error, dated April 10, 1968, and the appellant's brief, undated, were all filed on May 6, 1968, in the office of the Mercer County clerk of court. No demand for trial de novo was made by the State as it had elected to stand upon the errors appearing upon the face of the judgment roll.

Knife River did not appeal from this judgment.

On May 10, 1968, after the time for appeal had expired, Knife River served on Permann an application for extension of time to settle the statement of the case, dated May 9, 1968, and filed the same on May 23, 1968, in the office of the Mercer County clerk of court.

The State, on May 10, 1968, after the time for appeal had expired, served on Permann an application for extension of time to settle the statement of the case. The State made no demand for trial de novo; however, in the application for extension of time, reference was made to the desire of Knife River to have the matter on appeal decided on the merits on a trial de novo in the supreme court. The hearing date thereon was set for May 20, 1968, at which hearing, over the objection of Permann, the court extended the time for settling the statement of the case for 45 days, and ordered the State to pay costs to Permann of $150.00, which Permann declined to accept.

On May 23, 1968, the State, not having done so earlier, ordered a transcript of the evidence from the court reporter.

On August 1, 1968, and after the extension of time of 45 days had expired, the State applied for a further extension of time to August 12, 1968, the hearing date thereon was set for August 7, 1968.

On August 5, 1968, Permann served written objections to a further extension of time on the grounds, among others, that the State had elected to base its appeal strictly upon the judgment roll, without furnishing a settled statement of the case, the State having determined not to furnish a settled statement of the case; that an extension of further time would delay the sending of the record to the supreme court, to the prejudice of Permann; and that the State had not made a showing of good cause, diligence, and excusable delay, and that such delay was not prejudicial.

The State, in its reply brief, dated August 6, 1968, to Permann's objection to extension of time to August 12, recited that the transcript was received in the office of the Attorney General from the court reporter on Saturday, August 3, 1968.

The State offered to furnish a copy of the transcript to Permann and present the transcript to the court for certification "as of the immediate moment." However, as the State had been informed that Mr. Sperry, one of Permann's attorneys, would not be available for three weeks, the State had no objection to Mr. Sperry having sufficient time to examine the transcript and make objections thereto. And if Mr. Miller, Permann's other attorney, desired to take the full statutory time of not less than fifteen days nor more than thirty days, the case would not get to the supreme court for a term prior to the October term. The State further asserted that Permann would not be prejudiced by trying the case at the October term because time is not of the essence. "Basically, the decision relates to ownership of the coal. * * * The facts as to title ownership will not change during a month's time, or even for that matter for a year's time."

The State reasserted the contention made in its affidavit in support of its first application for an extension of time within which to settle the statement of the case, that this appeal involves matters of public interest in regard to the procedures relating to the sale of school original grant lands, and that it is possible that the interest of the public at large, Knife River, and the State "could in some manner be prejudiced if the entire record were not before the Supreme Court on this appeal" and "it is possible that substantive justice might be served by having such entire record before the supreme court of this state on such appeal." The State also argued that from the pleadings, findings, conclusions, order and judgment the court could find either for or against the State, but that the transcript of the proceedings

in the district court disclose additional grounds upon which the court could find for the State, with the result that the State will be prejudiced if the transcript is not made available to the supreme court.

On August 7, 1968, at the hearing, the court extended the time to August 28, 1968.

On August 13, 1968, the State moved for certification of statement of the case, the State having received the transcript from the court reporter on August 3, 1968. The State made no demand for trial de novo, nor did it include in its motion a request that a demand for trial de novo be included in the settled statement of the case, although in the proposed form of the certification of the statement of the case, accompanying the motion, reference was made to include a demand for trial de novo in the settled statement of the case. The hearing date on the motion was set for September 4, 1968.

On August 20, 1968, Judge Muggli suggested by letter to the parties that the hearing be held on August 29, 1968, instead of on September 4, 1968.

On August 23, 1968. Permann served objections to the proposed certification of the statement of the case, including an objection to setting the date of the hearing thereon for September 4, 1968, for the reason that it was beyond and later than August 28, 1968, the date which had been set to complete and certify the record. He also objected to the contents of the proposed statement on the grounds that it included a demand for trial de novo and that it did not identify the exhibits. He petitioned the court, if and when it did settle the statement of the case, that it include therein a transcript of the proceedings held on August 7, 1968, extending the time to August 28, 1968.

On August 27, 1968, Permann served and filed additional objections to certification of statement of the case on the following grounds:

(1) That the State had perfected an appeal from the judgment and from the entire judgment roll " * * * * based strictly upon the judgment roll, no statement of the case having been settled and no motion having been made to settle the statement of the case"; that the State assigned twenty-nine specifications of error; that the State made no demand for trial de novo; and that there are no specifications of the insufficiency of the evidence;

(2) That the affidavit supporting the motion for extension of time stated, "This defendant had determined not to supply a record of the proceedings and a statement of the case, and had further determined to rely only on the judgment roll."

(3) That the time for appeal had expired;

(4) That the time for settling the statement of the case herein had twice been extended;

(5) That the State had not made a showing of good cause for granting such extension.

On August 29, 1968, the date of the hearing suggested by the court, there was no appearance by Permann, and the hearing date was continued.

On August 31, 1968, the hearing date for certification of statement of the case was continued from September 4, 1968, to September 16, 1968, by the court on its own motion. This was served on September 4, 1968.

On September 6, 1968, a demand for trial de novo by the State, undated, was served on Permann, and was filed on September 9, 1968, in the Mercer County clerk of court's office.

At the hearing on September 16, 1968, the court orally declared in open court that it would certify the list of exhibits in the transcript, correct the reporter's certificate accordingly, permit the State to include the demand for trial de novo in the settled statement of the case, that these additional

proceedings be included therein, and that further time be extended to October 8, 1968. However, on September 20, 1968, the court, on its own motion, in its written order, extended the time to the 6th day of October, 1968, instead of October 8, as originally announced orally.

On October 8, 1968, over objection of Permann, the court settled the statement of the case, dating it October 2, 1968, and included therein the demand for trial de novo.

■■■ It is well settled in this state that a statement of the case may be settled after the expiration of time limited by statute. N.D.C.C. § 28–18–06. Schriock v. Schriock, 128 N.W.2d 852 (N.D.1964). And where a statement of the case is settled after the time limited without an extension of time having been granted, the order of settlement itself operates to extend the time for settlement. Johnson v. Northern Pacific Ry. Co., 1 N.D. 354, 48 N.W. 227 (1890), cited in Schriock v. Schriock, *supra*.

In Zarak v. Hjelle, 154 N.W.2d 377 (N.D.1967), we said that an application for an extension of the time within which the statement of the case may be settled must be made to the trial court upon a showing of good cause. Citing Kline v. Landeis, 147 N.W.2d 897 (N.D.1967); Schriock v. Schriock, *supra*. We also said in Zarak v. Hjelle that the determination of whether good cause had been shown is for the trial court to make and, unless the decision of the trial court indicates an abuse of discretion, it will not be reversed on appeal.

In Kline v. Landeis, 147 N.W.2d 897 (N.D.1967), where the only reason stated in the affidavit for defendant's failure to move for a settled statement of the case within the statutory period was the financial difficulties of the defendants which precluded them from paying the cost of a transcript, and by such failure the defendants had delayed the time within which they would normally prepare, serve and file their brief on appeal, we said that if the extension were granted it would operate to delay the hearing on appeal beyond the period required in the ordinary course. We said the delay had not been satisfactorily accounted for by the appellants. And we held that the trial court had not abused its judicial discretion in denying the application, this court saying that if finances were a problem an application could have been made within the statutory period for an extension of time within which to settle the statement of the case.

In Smith v. Hoff, 20 N.D. 419, 127 N.W. 1047, 1050 (1910), this court laid down tests to determine whether or not the party applying after the expiration of the statutory time is entitled to an extension of time for settlement of the statement of the case, as follows:

(1) Do the facts shown by appellant as cause for an extension indicate that he is prosecuting the appeal in good faith upon meritorious grounds, without intent to delay its orderly and timely dispatch? (2) If the extension applied for is granted, will it operate to delay the hearing of the appeal beyond the period required in the ordinary course; and, if so, is this delay satisfactorily accounted for by the appellant'? (3) Is the respondent prejudiced or will he to any degree whatever be placed at a disadvantage upon appeal by excusable delay of appellant in the performance of the preliminary steps?

■■■ The burden is upon the party making the motion to quash a settled statement of the case to present a record showing affirmatively:

(1) That the evidence adduced was insufficient as a matter of law to constitute a showing of good cause; and

(2) That the trial court abused its discretion in finding that good cause did, in fact, exist to justify its order granting appellant an extension of time within which to perfect the record upon appeal after the time allowed by law had expired.

Verry v. Murphy, 163 N.W.2d 721, 726 (N.D.1968).

■ We find that Permann has sustained the burden to present a record of the proceedings relating to the application for an extension of time to settle the statement of the case. Here the record before us consists of the application for extension of time, the affidavits in support thereof and the affidavits in opposition thereto, the briefs of the parties, and the transcripts of the hearings on the applications.

Although Knife River had not appealed, it also had applied for an extension of time within which to settle the statement of the case, after the time for appeal had expired. The substance of the affidavit and brief in support of its application was that it had not appealed from the judgment on the assurance that the State would appeal from the judgment; that the appeal by the State asking for a review of the errors appearing on the judgment roll only would not present the entire record for the review of the supreme court; that it would be prejudiced on appeal by not having the record before the supreme court; that it should be able to have the matter on appeal decided on its merits; that the appeal involves matters of public interest; and that it had not ordered any transcript, and would not do so unless the court would issue its order granting an extension of time within which to settle the statement of the case. Without determining whether Knife River may apply for an extension of time within which to apply for a settled statement of the case, we find that the showing made by Knife River was insufficient to show good cause for the granting of its request.

The affidavit on the part of the State in support of its application for settlement of the statement of the case recited that it had intended to appeal from the judgment upon errors of law appearing on the judgment roll only, and therefore had determined not to furnish a settled statement of the case, but at the request of Knife River, who, although a party in the action below, had not appealed, was making application for extension of time within which to settle the statement of the case. The affidavit also stated that matters of public interest were involved relating to the sale of school grant lands, and that Knife River and the State could in some manner be prejudiced if the entire record were not before the supreme court. But the affidavit fails to show what or how these interests may be involved or prejudiced.

The pertinent parts of the affidavit of the State in support of its application for extension of time read as follows:

[T]hat in said appeal, this defendant, had determined not to supply a record of the proceedings and a settled statement of the case, and had further determined to rely only on the judgment roll.

That your affiant is informed and verily believes that defendant, Knife River Coal Mining Company * * * feel that they should be able to have the above matter on appeal decided on its merits on a trial de novo in the Supreme Court, which would necessarily involve having the complete record in the above entitled matter before the Supreme Court.

That your affiant is further informed and further verily believes that defendant, Knife River Coal Mining Company, * * * would be prejudiced on appeal by not having the record before the Supreme Court as to the testimony of the State Land Commissioner * * * as to the hearing instituted by said * * * Knife River Coal Mining Company, before said board in April of 1966 which does not appear on the judgment roll.

That the appeal in this action does involve matters of public interest, viz. the procedures in regard to sale of and issuance of patents to Original Grant School Lands, with regards to the state's ownership of coal, including lignite coal.

That it is possible that the interest of the public at large * * * Knife Riv-

er Coal Mining Company, * * * Board of University and School Lands, and * * * State of North Dakota, could in some manner be prejudiced if the entire record were not before the supreme court on this appeal.

It is possible that substantive justice might be served by having such entire record before the supreme court of this state on such appeal.

\* \* \* \* \* \*

The transcripts of the hearings on August 7 and September 16, 1968, on the applications for further extension of time, do not disclose any excuse or good cause for the delay in preparing the statement of the case.

Nor was there any reasonable excuse shown by the State for its failure to take the preliminary steps to settle the statement of the case within the time limited by law.

The affidavit of the State in support of its application for a settled statement of the case fails to establish good cause for extending the time for settling the statement of the case. Its only reason for making application for extension of time within which to settle the statement of the case is that it was requested to do so by Knife River, and that it may be possible that substantive justice might be served by having such entire record before the supreme court, and that the State could in some manner be prejudiced if the entire record were not before the supreme court. However, it does not set out in any detail the manner in which the State may be prejudiced or how substantive justice might be served by having the entire record. And therein the State reaffirmed its position that it originally had determined not to secure a settled statement of the case and had further determined to rely only on errors of law appearing on the judgment roll.

The State obtained the settled statement of the case for the reason, in the words of the attorney for the State on oral argument, "because if the record is before this court, this court will know everything the district court made known, which isn't * * * more than is in the findings of fact. * * *" And, "A certified statement of the case will tell this court that that is all the evidence there is as to the determination made by the Board of University and School Lands," and the State is not contending that the findings of fact are not justified by the record but that "the findings of fact are fine except * * * it says that the Board of University and School Lands did decide that these were not coal lands. At that point is where we differ."

Permann has sustained his burden of presenting a record showing affirmatively that the State has failed to establish good cause for the extension of time for settling the statement of the case. Therefore, the trial court's granting of the motions for extension of time to settle the statement of the case constituting an abuse of judicial discretion, the motion of Permann is granted for an order quashing the demand for a trial de novo and for an order quashing the certification of the statement of the case made by the trial judge.

It appears that the State is adhering to its original position that its appeal from the judgment is based strictly upon errors of law appearing on the judgment roll. In fact, the State has not filed any supplementary brief incorporating any issues, specifications, or arguments as on an appeal trial de novo, except a brief entitled *Supplementary Authorities*, presenting the same arguments as in the original brief. The State has not abandoned the issues raised nor the arguments contained in its brief attacking the conclusions of law as not being sustained by the findings of fact.

In this case the State first elected to appeal from the judgment on errors of law appearing on the judgment roll only, and served and filed simultaneously with the notice of appeal the specifications of error

and its brief, apparently upon the theory that it was proceeding under N.D.C.C. § 28–18–09, and asserted in its brief that it did not intend to furnish a settled statement of the case, as its appeal was based on errors of law appearing on the judgment roll. Concisely stated, the State contends that the conclusions of law are not sustained by the findings of fact found by the trial court.

The State then proposed to change the nature of its appeal by demanding a trial de novo in this court under N.D.C.C. § 28–27–32, and furnished a settled statement of the case. As we have determined that the settled statement of the case and the demand for trial do novo should be set aside, we need not determine whether or not the appellant may change the nature of its appeal after the time for appeal has expired.

■ On an appeal from a judgment in a case tried by the court without a jury the appellant may proceed under N.D.C.C. § 28–27–32 and demand a trial de novo or a review of specified facts; or he may proceed under N.D.C.C. § 28–18–09 and demand a review of specified errors of law, or specify that the evidence is insufficient to sustain the decision of the court. Comford v. Locken, 61 N.W.2d 912 (N.D. 1953); First National Bank of Crary v. Bremseth, 60 N.D. 401, 234 N.W. 758 (1931). In each of the above cases, the appellant must furnish a settled statement of the case. Martin v. Rippel, 152 N.W.2d 332 (N.D.1967); Ricks v. Bergsvendsen, 8 N.D. 578, 80 N.W. 768 (1899), (trial de novo under N.D.C.C. § 28–27–32); Leu v. Montgomery, 31 N.D. 1, 148 N.W. 662 (1914), (appeal under N.D.C.C. § 28–18–09).

■ When the appellant has not demanded a trial de novo or a review of specified facts under N.D.C.C. § 28–27–32, nor served with the notice of motion for new trial or notice of appeal specifications of errors of law, or specified that the evidence is insufficient to support the verdict or decision of the court, under N.D.C.C. § 28–18–09, the supreme court reviews only errors of law appearing on the face of the judgment roll which are assigned and argued by the appellant in his brief. Mevorah v. Goodman, 65 N.W.2d 278 (N.D. 1954). And under this latter mode of review in this court the statement of the case need not be settled. N.D.C.C. § 28–27–28; Leu v. Montgomery, *supra*. And only errors of law which are assigned and argued by the appellant in his brief will be reviewed by this court. Mevorah v. Goodman, *supra*.

■ In Wilson v. Kryger, 29 N.D. 28, 149 N.W. 721 (1914), where defendant had appealed upon alleged errors appearing upon the judgment roll only, and without settling a statement of the case, we said that where a statement of the case is not settled, and the questions to be raised on the appeal were not errors of law occurring on the trial but, instead, were only errors of law appearing on the face of the judgment roll, no specifications of error need be taken at all, and no specifications of error therefore need be served with the notice of appeal, or at all. All that is necessary to have such errors of law appearing on the face of the judgment roll reviewed is to assign and argue in the brief the errors complained of. In that case the insufficient specification of error taken and served, not being necessary, was disregarded, and only the alleged errors of law assigned in the brief on the judgment roll were passed upon.

Accordingly, the specifications of error served simultaneously with the notice of appeal by the State, will be disregarded and the errors of law assigned and argued in the brief on the judgment roll will be considered.

■ As we have determined that this appeal is taken on the judgment roll alone, the findings of fact as made by the trial court must be taken as correct. The issue is whether the judgment is supported by the findings of fact.

The State in its brief presented four issues:

(1) Whether coal is a "mineral" within the meaning of the phrase "oil, natural gas, or minerals" contained in the "contract" and in the "patent," according to § 38–09–01, N.D.C.C., and if so whether fifty per cent of the coal was reserved to the state;

(2) Whether the transactions between the State and the plaintiff were void from their inception, by reason of the prior knowledge that this was coal land at the time of the inception of such transaction;

(3) Whether the contracts became void after inception by reason of subsequent information that this was coal land;

(4) Whether, if the contracts were valid, any minerals were transferred, or any minerals were reserved in the State by the amendment of § 155 of the North Dakota Constitution by Article 71 of amendments thereto. (S.L.1959, ch. 436, approved June 28, 1960).

As to the first issue, it is not necessary to determine whether or not "coal" is a "mineral" and therefore includable under the provisions of § 38–0901, N.D.R.C.1943, reserving to the State "all oil, natural gas, or minerals," which reservation is set forth in the contracts and the patent, for the reason that § 155 of the North Dakota Constitution and §§ 15–0506 and 15–0620, N.D.R.C.1943, prohibit the sale of "coal lands," not merely the sale of "coal" in or under the land.

A purchaser from the State acquires certain contract rights and upon full payment of such contract is entitled to a patent under § 158 of the North Dakota Constitution. Any clause in any contract for the sale of school grant lands, or in the patent to such lands, in direct contravention of constitutional provisions, is unconstitutional and ineffective insofar as it relates to the sale of school grant lands.

The Constitution, and the statutes enacted in compliance therewith, is the authority under which the officers of the state act, and not the recitals in the contract or in the patent that determine its scope and validity. Kopplin v. Burleigh County, 77 N. D. 942, 47 N.W.2d 137 (1951).

In this case the mandate of the Constitution is that in conveying school grant lands, coal lands belonging to the state shall never be sold. The reservation of coal lands to the state in a contract or patent conveying school lands is void because it is in contravention of the constitutional and statutory provisions prohibiting the sale of "coal lands," and the contracts and patent must be construed as though they contained only the reservation required by statute (§ 38–0910, N.D.R.C.1943) as limited by the Constitution (§ 155, N.D. Const.) and the State is estopped from asserting a right to the reservation of coal. Convis v. State, 104 N.W.2d 1 (N.D.1960); State v. Oster, 61 N.W.2d 276 (N.D.1953).

The second issue raises the question whether the contracts and patent were void from inception by reason of prior knowledge that this was coal land, and the related question—raised by the third issue—whether the contracts became void after inception by reason of subsequent information that this was coal land, may be considered together.

These issues raise the question whether these lands are "coal lands" within the prohibition of the North Dakota Constitution, § 155, "That coal lands of this state shall never be sold," and that these lands have been sold in violation of § 155.

The sale of coal lands at the time the Permann contracts were made was prohibited by the Constitution and by statute. Section 155 of the North Dakota Constitution and § 15–0506, N.D.R.C.1943.

The Board of University and School Lands is vested with the power to

sell original grant school lands by § 156 of the Constitution:

> [S]aid board shall have control of the appraisement, sale, rental and disposal of all school and university lands * * *.

In furtherance of this grant of power, the legislature has provided as follows:

> The board shall have:
>
> 1. Full control of the selection, appraisement, rental, sale, disposal and management of:
>
>    a. Lands donated or granted by or received from the United States, * * *.

North Dakota Revised Code 1943, § 15-0102.

Judge Burke, in State v. Oster, 61 N.W. 2d 276, 278 (N.D.1953), discussed fully the duties of the Board and the procedures to be followed in sales of school grant lands that are pertinent to this case:

> The statutes also provide in detail for the selection of lands for sale, the manner of the sale thereof, the approval of sales, the conditions upon which sales are void, and the issuance of patents conveying sold lands to the purchasers thereof.
>
> Sec. 15-0507, NDRC1943, enacted as c. 176, Laws of N.D.1903, provides:
>
> "The board of university and school lands, with the assistance of the state geologist, shall ascertain and determine the quantity and description of all lands under its control on which coal exists and shall compile and keep a statement and schedule of all such lands."
>
> Before any original grant lands may be sold they must be selected and certified by the Board of University and School Lands. Sec. 15-0606, NDRC1943, Sec. 168, R.C.1905. Such lands must be sold at auction to the highest bidder upon a long time contract for deed. Sec. 15-0610, NDRC1943, Sec. 171, R.C.1905. No prepayments upon such contracts for deed may be made until after five years from the date of the sale. Sec. 15-0617, NDRC1943, Sec. 189, R.C.1905. Any sale made by mistake or not in accordance with law, or obtained by fraud, may be set aside and *the contract of purchase,* declared to be of no effect. Sec. 15-0806, NDRC1943, Sec. 176, R.C.1905. All sales are required to be approved by the Board of University and School Lands and no sale shall be approved "unless, from an examination of the certified lists and other information received and investigation made, it shall appear to the board that the sale was made in accordance with the provisions of this title and without fraud or collusion." Sec. 15-0805, NDRC1943, Sec. 174, R.C. 1905. After full compliance with all of the terms of his contract, the purchaser shall be issued a patent, "signed by the governor and attested by the secretary of state with the great seal of the state, and shall be countersigned by the commissioner of university and school lands with the seal of the board." Sec. 15-0816, NDRC1943, Sec. 189, R.C.1905.

A consideration of the foregoing constitutional and statutory provisions, makes it clear that, while the sales of state lands are surrounded with multiple safeguards to insure against illegal sales, inadequate price and fraud and collusion and to procure an avoidance of contracts of sale for such reasons prior to the issuance of a patent; it was nevertheless the constitutional and legislative intent that after a good faith determination by the board that the sales were not subject to such infirmities, and the issuance of patents to the lands sold, that all questions of legality should be concluded and the sales should be final and irrevocable.

State v. Oster, *supra,* was an action by the State to cancel letters patent conveying to the defendant the title to certain grant school lands. In 1916 the State sold cer-

tain provisional school grant lands according to the terms of a contract for deed. Oster, upon full compliance with all of the conditions of the contract, received from the State a patent conveying fee title to said lands on July 2, 1928. The contract for deed provided "That if the described land shall be found to be 'coal land' and that the same has been sold in violation of Section 155 of the Constitution of the State of North Dakota, then, and in that case, the said land shall immediately revert to the State, and this contract shall at once become null and void." At some time in the year 1950 the State discovered that the conveyed lands were "coal lands" and that the sale, therefore, was in violation of § 155 of the Constitution of the state of North Dakota. The State then brought an action to cancel the patent issued to Oster.

In *Oster,* the court stated the question to be determined as follows:

> The question is whether the complaint states a cause of action and this, in turn, depends upon whether the state may, after its qualified officers have found that land was legally subject to sale and have issued a patent therefor, challenge the sale upon the ground that the nature of the land was such that its sale was prohibited by the Constitution.

State v. Oster, 61 N.W.2d 276, 278 (N. D.1953).

This Court, in Syllabus 4, held:

> The decision reached by the Board of University and School Lands in passing upon the validity of a contract for the sale of school lands, that such lands were not "coal lands" and therefore legally subject to sale is, in the absence of fraud or other evidence impugning the good faith of the board, final and the title thereafter conveyed by a patent issued to the purchaser of such lands may not be defeated by a subsequent discovery of a coal deposit therein.

State v. Oster, *supra,* Syllabus 4.

In *Oster,* in substance, the court held that the patent issued to the purchaser of school lands may not be defeated by a subsequent discovery of a coal deposit therein in an action brought by the State for that purpose.

In the present case, we have the same question as to the Northwest Quarter of Section 12 where the State has issued a patent to Permann wherein there was included the same provision relating to the reversion to the State if the land shall be found to be "coal land." As to the Northeast Quarter of Section 12, the contract for deed is still viable and the patent has not been issued by the State.

It appears that *Oster* settles the question as to the Northwest Quarter of Section 12 where the patent has been issued, that the patent may not be defeated and that it conveys a good and valid title to the Northwest Quarter of Section 12 to Permann free and clear of the reservation to the State if such land is found to be coal land.

As to the provision in the contract for deed as to the Northeast Quarter of Section 12 relating to reversion to the State if the land shall be found to be coal land and sold in violation of § 155 of the Constitution that the land shall immediately revert to the state and "this contract shall at once become null and void," it is also largely determined by the decision in State v. Oster, *supra.*

The court's holding in Syllabus 4 declares that the action or decision reached by the Board in passing upon the validity of a contract for sale of school lands, that such school lands were not "coal lands" and therefore legally subject to sale, is final, in the absence of fraud or other evidence impugning the good faith of the Board. From this syllabus, it is apparent that the time at which the decision is made to determine whether or not these lands are coal lands is at the time of entering

into the contract for the sale of school lands.

There is dictum in the case of State v. Oster, *supra,* that provides that the State, prior to the issuance of patents, is required three times to pass upon the question of whether the lands are legally subject to sale: first, when it selects the lands to be offered for sale; second, when it approves the contract for sale; and, third, when it directs the issuance of the patents.

█ It appears that the court in stating that there is a third time, when it directs the issuance of patents, when it may pass upon the question of whether the lands are legally subject to sale arises from the conclusion that "The board has a five year period between the time of the sale and the time when the purchaser may elect to make prepayments on his contract, in which to make investigation as to individual sales before giving its final approval thereto." However, upon a review of the debates before the Constitutional Convention, it appears that this is an erroneous conclusion and that the five-year period was established to provide a period of time within which the State would receive enough income during the first years, until some default was made, to pay a good rental for the use of the land. There is no discussion in the Constitutional Convention debates that the five-year period provided time in which to make investigations as to individual sales before giving its final approval thereto. Insofar as the third condition recited above is concerned, we do hereby disapprove it as a further time in which the State may determine whether or not lands sold by it under contract for deed may be disapproved and declared null and void.

It has been held that in order for lands to be considered "mineral lands" or "coal lands" there must be a determination that the land will be valuable on account of its mineral or coal deposits to be worked as a mine. The court further said that a change in the conditions occurring subsequent to the sale, whereby new discoveries are made, or by means whereof it may become profitable to work the veins as mines, cannot affect the title as it passed at the time of the sale.

Surface indication of veins of coal does not constitute a mine, nor does such surface indication prove that the land may become sufficiently valuable on account of its coal deposits to be worked as a mine.

In Colorado Coal and Iron Co. v. United States, 123 U.S. 307, 328, 8 S.Ct. 131, 141, 31 L.Ed. 182, the Supreme Court of the United States said:

> The circumstances that there are surface indications of the existence of veins of coal does not constitute a mine. It does not even prove that the land will ever be under any conditions sufficiently valuable on account of its coal deposits to be worked as a mine. A change in the conditions occurring subsequently to the sale, whereby new discoveries are made, or by means whereof it may become profitable to work the veins as mines, cannot affect the title as it passed at the time of the sale. The question must be determined according to the facts in existence at the time of the sale. If upon the premises at that time there were not actual "known mines" capable of being profitably worked for their product, so as to make the land more valuable for mining than for agriculture, a title to them acquired under the pre-emption act cannot be successfully assailed.

In Dower v. Richards, 151 U.S. 658, 663, 14 S.Ct. 452, 454, 38 L.Ed. 305, the United States Supreme Court approved a decision of the Supreme Court of California which required that the minerals known to exist must be valuable for mining purposes:

> There can be no doubt that the decision of the Supreme Court of the State in this respect was correct. It is established by former decisions of this court, that, under the acts of Congress which govern this case, in order to except mines or mineral lands from the opera-

tion of a town-site patent, it is not sufficient that the lands do in fact contain minerals, or even valuable minerals, when the town-site patent takes effect, but they must, at that time, *be known* to contain minerals of such extent and value as to justify expenditures for the purpose of extracting them; and, if the lands are not known at that time to be so valuable for mining purposes, the fact that they have once been valuable, or are afterwards discovered to be still valuable, for such purposes, does not defeat or impair the title of persons claiming under the town-site patent. [Emphasis added.]

█ The question of prior knowledge of coal at the time of the contracts must be determined according to the facts in existence at the time of the sale.

The court here found as a fact that there was no prior knowledge of coal on these lands at the time of the inception of these contracts.

█ The conclusions of law are amply supported by the findings of fact. The findings of fact must state that the lands must be known at the time of the sale to contain valuable minerals (Deffeback v. Hawke, 115 U.S. 392, 6 S.Ct. 95, 29 L.Ed. 423), be profitable to mine, and be in sufficient quanity to justify the expense for its extraction (Davis v. Wiebbold, 139 U.S. 507, 11 S.Ct. 628, 35 L.Ed. 238).

There is no finding of fact here that the coal was valuable, nor that it would have been profitable to mine, nor that coal existed in sufficient quantity to justify the expense of mining at or before the time the contracts were made.

The court determined by its findings of fact that prior to the sale of these lands to Permann the state engineer officially reported to the State that these lands were not coal lands; that a geological survey published by the state geologist indicated that lignite coal in various ranges of thickness could be found in an area covering five hundred square miles, including these lands, but did not specifically designate coal on these lands; that a field agent for the State reported a small coal mine on the Northeast Quarter of Section 12; that the United States Department of the Interior produced a circular on lignite resources in North Dakota in 1953 which indicated coal deposits on Township 143, Range 98; and that after the sale of these lands to Permann, Knife River made tests for coal in 1961 and 1962 on these lands.

The court further found that prior to such sales neither the State nor the plaintiff was aware that these lands contained coal, or that either party acted fraudulently or acted through any mistake of law or of fact.

From these findings of fact the court concluded as a matter of law that the State was required by statute to compile and keep a statement of the schedule of all coal lands in the State; that prior to the sale of these lands the State had a record and schedule that these lands were not "coal lands" and determined that these lands were not coal lands; that said sales were made in good faith, free from fraud, and were approved after the making of such determination; that the determination of the State was final and conclusive. The court further concluded, as a matter of law, that the determination of the State that these lands were not coal lands was legally made, that these lands were legally subject to sale; that the title conveyed to plaintiff was legal and cannot be defeated by subsequent discovery of coal notwithstanding any reservations of coal in the contracts or patent.

The court further concluded as a matter of law that the execution and delivery of the contracts and patent by the State to the plaintiff on these lands was and is a determination by it that the lands embraced were not coal lands; that plaintiff has been in possession of said lands, under said contracts, since November 1, 1947; that the State is estopped from claiming or reserving coal on such lands and from at-

tacking the validity of said contracts or said patent.

Further, that the reservation in said patent attempting to reserve the coal to the State was beyond the power of the State, is void, and does not constitute a reservation of coal.

The fourth issue raised by the State presents the question whether any minerals were transferred to Permann at all, or whether the minerals were reserved to the State by the amendment of § 155 of the North Dakota Constitution by Article 71 of the amendment adopted June 28, 1960.

By this amendment the sale of coal lands is no longer prohibited but did provide for the reservation of all minerals to the State in the following language:

> In all sales of lands subject to the provisions of this article all minerals therein, including but not limited to oil, gas, coal, cement materials, sodium sulphage, sand and gravel, road material, building stone, chemical substances, metallic ores, uranium ores, or colloidal or other clays, shall be reserved and excepted to the state of North Dakota, except that leases may be executed for the extraction and sale of such materials in such manner and upon such terms as the legislative assembly may provide.

Art. 71, June 28, 1960.

The State suggests that since there is now no constitutional provision prohibiting the sale of coal lands, that it is possible that the contracts and actions subsequent to the date of the amendment might be construed as creating a contract to sell coal lands and reserving all minerals therein, including coal, to the State.

We do not construe the position of the State to contend that the amendment has a retroactive effect to make the provisions of the amendment a part of the contracts and patent with Permann.

■ However, if it be inferred by the State that the provisions of the amendment form a part of the contracts and patent with Permann, such inference is not well taken.

■ The law of the land and the existing statutes at the time the contract is entered into form a part of the contract and become a part of the contract as if incorporated therein in full. Schue v. Jacoby, 162 N.W.2d 377 (N.D.1968); Ireland's Lumber Yard v. Progressive Contractors, Inc., 122 N.W.2d 554 (N.D.1963).

■ The right of contract is protected, not only by the constitution of the state, but also by the federal constitution. Sections 1 and 13, N.D.Const.; Fourteenth Amendment, U.S.Const.; Merchants' State Bank v. Sawyer Farmers' Co-op. Ass'n, 47 N.D. 375, 182 N.W. 263.

In Fisher v. Betts, 12 N.D. 197, 96 N.W. 132 (1903), we held at Syllabus 3:

> No subsequent legislation could repeal the law in force when the sale was made, so as to change the effect of the deed as evidence in matters of substance, as that would be impairing the validity of a contract.

And in *Fisher*, at page 135, we said:

> The Legislature will not be permitted, under the guise of changing a remedy or a rule of evidence, to impair a vested right under an existing contract; and the presumption that all requirements of law with respect to the sale had been complied with, raised by the delivery of the tax certificate, was raised in favor of the tax purchaser by the law in force at the time of his purchase.

■ Nor may constitutional provisions operate retrospectively to abrogate or otherwise affect property rights that are vested at the time of their adoption. To hold otherwise would render contracts made before the adoption of constitutions or amendments thereto invalid, since a state constitution or an amendment thereto is a law within the meaning of the provision of the constitution of the United States pro-

hibiting the enactment of laws impairing the obligations of contracts. Art. 1, Section 10, U.S.Const.; 16 C.J.S. Constitutional Law § 40.

■ The denial of a vested right under a contract, by a state constitution subsequently adopted, impairs the obligation of the contract and is a deprivation of property without due process of law. Houston & T. C. R. Co. v. Texas, 170 U.S. 243, 18 S. Ct. 610, 42 L.Ed. 1023, cited in 16 Am.Jur. 2d, Constitutional Law, § 373.

In 16 C.J.S. Constitutional Law §§ 215 and 216, the text writer states that vested property rights are protected by the provisions of the Fourteenth Amendment that no state "shall deprive any person of life, liberty, or property without due process of law."

The findings of fact establish that these lands were not "coal lands" at the time of the sale to Permann, and under the authority of *Oster* the determination made by the Board of University and School Lands at the time of the sale is final, and neither the contract for sale nor the patent may be cancelled upon the discovery of coal after the issuance of the contract for sale.

Finally, we should consider the argument of the State that matters of public interest were involved in the sale of school grant lands, and that in some way the interests of the State may be prejudiced.

In Wilson v. Divide County, 76 N.W.2d 896 (N.D.1956), we said:

It will be presumed that official duty has been regularly performed and evidence is necessary to overcome that presumption.

Wilson v. Divide County, *supra,* Syllabus ¶ 5. Subsection 15, § 31–11–03, N.D.C.C.

When power or jurisdiction is delegated to any public officer over a subject matter, and its exercise is confided to his discretion, the acts done in the exercise of the authority are, in general, binding and valid as to the subject matter. The only question which can arise between the individual and the public, or any person denying their validity, are power in the officer and fraud in the party.

43 Am.Jur., Public Officers, § 254, p. 71, citing Belcher v. Linn, 65 U.S. (24 How.) 508, 16 L.Ed. 754.

The findings of fact of the trial judge did not establish that fraud, either actual or constructive, was involved in the sale of the land by the State. As to the authority of the Board of University and School Lands, we find that the board has been granted jurisdiction over the sale of school lands. § 156, North Dakota Constitution. Further, that it has by statute the specific duty and power of determining whether the lands under its jurisdiction are coal lands. N.D.C.C. § 15–05–07. We have held that the board has "full" control of the sale of lands under its jurisdiction and that its determination in these matters is discretionary and it "is the approval of the board, not of courts, upon which the question of alienation of state property depends." Fuller v. Board of University and School Lands, 21 N.D. 212, 129 N.W. 1029 (1911).

It is true that the patent has been issued in many instances without the investigation and consideration which the public interest requires; but if that has been done without fraud, though unadvisedly, by officers of the government charged with the duty of supervising and attending to the preparation and issue of such patents, the consequence must be borne by the government, until, by further legislation, a stricter regard to their duties in that respect can be enforced upon them.

Barden v. Northern Pacific Ry. Co., 154 U.S. 288, 331, 14 S.Ct. 1030, 1039, 38 L. Ed. 992.

See also, Bartlett v. Kane, 57 U.S. (16 How.) 263, 14 L.Ed. 931; United States v. Arredondo, 31 U.S. (6 Pet.) 691, 8 L.Ed. 547.

The judgment is affirmed.

TEIGEN, C. J., PAULSON, STRUTZ, and ERICKSTAD, JJ., concur.