Alice ABBEY, Plaintiff and Appellant,

v.

STATE of North Dakota, Acting through the Board of University and School Lands, and the Knife River Coal Mining Company, Defendants and Respondents.

Civ. No. 8844.

Supreme Court of North Dakota.

Nov. 29, 1972.

Raymond M. Hagen, Beulah, Sperry & Schultz, Bismarck, and Harvey J. Miller, Dickinson, for plaintiff and appellant.

Helgi Johanneson, Atty. Gen., and Thos. O. Smith, Asst. Atty. Gen., for the State of North Dakota.

Pearce, Engebretson, Anderson & Schmidt, Bismarck, for Knife River Coal Mining Co.

ERICKSTAD, Judge.

By complaint dated the 25th of November 1968, Alice Abbey commenced an action to quiet title to the South Half of Section 12 in Township 143 North, Range 88 West of the Fifth Principal Meridian, in Mercer County, North Dakota.

It is asserted in the complaint that Mrs. Abbey acquired title to this property from Charles Herman, who acquired title to it under two patents executed by the Board of University and School Lands of the State of North Dakota; that the State has claimed an interest in fifty percent of all the coal in the premises, and that through a lease with the defendant Knife River Coal Mining Company the State has re-

ceived approximately $37,000 in coal royalties; that the said coal company claims rights as a lessee of the State of North Dakota.

Mrs. Abbey asks that the title to all the coal in the premises be quieted in her name and that the State be required to account to her for all money received by the State in payment of coal royalties for coal removed from the premises.

In its answer the State denies that Mrs. Abbey is the fee owner of all the coal in the premises and affirmatively alleges that the land is coal land and that coal lands of the State "shall never be sold, and have not been sold, and that said Defendant State of North Dakota is the fee title owner of the described premises subject to a valid and subsisting coal lease to defendant, Knife River Coal Mining Company."

The State also "affirmatively alleges that the Defendant, State of North Dakota, has claimed and does claim an interest in and to 50% of all coal in and under the premises pursuant to Section 38–09–01 of the North Dakota Century Code and Section 38–0901 of the North Dakota Revised Code of 1943 and that the Defendant, Knife River Coal Mining Company, claims rights as a lessee of the State of North Dakota, under a certain coal mining lease executed by the State of North Dakota."

The State asks that title to the fee be quieted in it and that it recover from Mrs. Abbey all royalty payments made to her under her lease to Knife River Coal Mining Company.

In its separate answer, the defendant Knife River Coal Mining Company asserts that it has one lease from Mrs. Abbey, covering fifty percent of all the coal in the said property, and one lease from the State, covering the other fifty percent of the coal in the property, and it asks that its leasehold interests in the coal be declared to be valid.

Mrs. Abbey's reply to the State's answer generally denies each and every affirmative allegation set forth therein.

The case was tried by the Honorable Norbert J. Muggli upon a stipulation of facts and exhibits, which reads:

"The above entitled action is herewith admitted to the Court, for decision, by all parties thereto upon the following agreed statement of facts, together with the exhibits and pleadings listed, which shall constitute the case upon which the Court may render Judgment, that the pleadings in the above action constitute the following:

"1. Summons and Complaint of the Plaintiff.

"2. Separate Answer of State of North Dakota.

"3. Separate Answer of Knife River Coal Mining Company.

"4. Reply of Plaintiff.

"That all of the above Pleadings have been duly served on parties hereto, and all parties agree that the Court has juridiction of the subject matter of this case, and that said pleadings are to be considered by the Court as part of this case; the Court shall be authorized to render Judgment upon the case, without a jury trial, subject to the right of either party to appeal from said Judgment as provided by law.

"The parties hereto agree that the following may be admitted as exhibits in the above case for the consideration of the Court in rendering Judgment:

"Plaintiff's Exhibit:

"No. 1: Mercer County Abstract # 24817, covering the real property to which title is in controversy.

"No. 2: Certified copies of the original patents from the State of North Dakota to Chas. Herman on the real property to which title is in controversy.

"No. 3: Certified copies of the two Coal Leases on the property from Alice Abbey to Knife River Coal Mining Com-

pany, and one from State of North Dakota to the Knife River Coal Mining Company.

"No. 4: Statement of all royalties that have been paid for the Defendant Knife River Coal Mining Company to the Plaintiff Alice Abbey, and to the Defendant, State of North Dakota.

"Defendant's Exhibits, State of North Dakota:

"No. 1: Affidavit of Publication in regard to the land sales.

"That the parties hereto agree to file with the Court within twenty (20) days after the filing of this Stipulation, Briefs in which the issues of law to be decided by the Court shall be stated by respective parties hereto; it being further agreed that the parties hereto agree to supply to the Court by Stipulation such further facts or exhibits that the Court may deem necessary, upon request, for a judicial determination of the issues contained in the pleadings."

As has been previously pointed out, the State in its answer asserts inconsistent defenses: one that the State owns all of the coal in the property described, and the other that the State owns one-half of the coal therein. Apparently, during the trial of the matter, the State abandoned its contention that it owned all of the coal in this particular property and relied upon its contention that it owned fifty percent of the coal.

█ Inconsistent defenses are permitted under Rule 8(e) of the North Dakota *Rules of Civil Procedure.* The pertinent part of Rule 8(e) reads:

"(e) Pleading to be concise and direct —Consistency.

"(1) * * *

"(2) * * * A party may also state as many separate claims or defenses as he has regardless of consistency and whether based on legal or on equitable grounds or on both. * * *"

In its memorandum opinion of December 14, 1971, the trial court in essence concluded that this property was acquired by the State of North Dakota from the Federal Government under Section 12 of The Enabling Act for public buildings at the State capital for legislative, executive, and judicial purposes; that only land granted to the State for the support of common schools under Section 10 of The Enabling Act was subject to the provision in Section 155 of the Constitution of North Dakota (as it read prior to its amendment on June 28, 1960) prohibiting the sale of coal lands of the State; that the patents whereby Mrs. Abbey's predecessor acquired title to the property were subject to all rights and privileges vested in the State of North Dakota under the provisions of the Constitution and the laws of the State; that under Section 38–0901 of the North Dakota Revised Code of 1943 fifty percent of all oil, natural gas, or minerals which may be found on or underlying such land are reserved to the State of North Dakota; that coal is a mineral within the meaning of Section 38–0901; that title should be quieted in the State to fifty percent of all oil, natural gas, or minerals, including coal, in the property; and that the State should retain the royalties collected under its lease with the defendant Knife River; that title should be quieted in Mrs. Abbey to fifty percent of all the oil, natural gas, or minerals, including coal, in the premises; and that Mrs. Abbey should retain the royalties that she had collected under her lease with the defendant Knife River; and that Knife River had two valid existing leases, one with the State of North Dakota and the other with Mrs. Abbey, to mine the coal in the property.

From a judgment dated the 24th of January 1972, based upon this memo and upon findings of fact, conclusions of law, and order for judgment dated January 17, 1972, to the same effect, Mrs. Abbey now appeals.

It should be noted that prior to the taking of this appeal from the judgment, Mrs. Abbey made a motion for new trial. This motion had not been decided as of the date of the oral argument before this court.

In this appeal we shall restrict ourselves to the issues raised on the appeal from the judgment. On appeal, Mrs. Abbey asserts eleven specifications of the insufficiency of the evidence and eighteen assignments of error.

We shall consider the issues raised by these specifications and assignments in what we deem to be their order of importance.

The first major issue is whether the prohibition against the sale of coal lands as previously contained in Section 155 of the Constitution of North Dakota applies to land acquired by the State under Section 12 of The Enabling Act.

Before we reach that issue, however, we must determine the source of the land involved in this lawsuit. Entry No. 2 of the Abstract filed in this case discloses that this land was acquired by the State under Section 12 of The Enabling Act, as public-building land. The trial court so found as a fact. Under Rule 52(a) of the North Dakota Rules of Civil Procedure the findings of fact of the trial court are not to be set aside unless clearly erroneous. As this particular finding of fact is not clearly erroneous, we affirm the trial court in that finding.

Pertinent are Sections 10, 12, and 17 of The Enabling Act (Approved Feb. 22, 1889), Chapter 180, 25 United States Statutes at Large 676, and Sections 153, 155 as it read prior to its amendment on June 28, 1960, Section 159, and Section 164 of the Constitution of North Dakota.

"10. That upon the admission of each of said states into the union, *sections numbered sixteen and thirty-six in every township* of said proposed states, and where such sections or any parts thereof have been sold or otherwise disposed of by or under the authority of any act of congress, *other lands equivalent thereto*, in legal subdivisions of not less than one-quarter section, and as contiguous as may be to the section in lieu of which the same is taken, are hereby granted to said states *for the support of common schools*, such indemnity lands to be selected within said states in such manner as the legislature may provide, with the approval of the secretary of the interior; provided, that the sixteenth and thirty-sixth sections embraced in permanent reservations for national purposes shall not, at any time, be subject to the grants nor to the indemnity provisions of this act, nor shall any lands embraced in Indian, military or other reservations of any character, be subject to the grants or to the indemnity provisions of this act until the reservation shall have been extinguished and such lands be restored to, and become a part of, the public domain." [Emphasis added.] Enabling Act of 1889.

"12. That upon the admission of each of said states into the union, in accordance with the provisions of this act, *fifty sections* of unappropriated public lands within such states, to be selected and located in legal subdivisions as provided in section 10 of this act, shall be, and are hereby, *granted to said states for public buildings at the capital of said states for legislative, executive, and judicial purposes*, including construction, reconstruction, repair, renovation, furnishings, equipment, and any other permanent improvement of such buildings and the acquisition of necessary land for such buildings, and the payment of principal and interest on bonds issued for any of the above purposes." [Emphasis added.] Enabling Act of 1889.

"17. That in lieu of the grant of land for purposes of internal improvement made to new states by the eighth section of the act of September 4, 1841, which act is hereby repealed as to the states

provided for by this act, and in lieu of any claim or demand by the said states, or either of them, under the act of September 28, 1850, and section 2479 of the revised statutes, making a grant of swamp and overflowed lands to certain states, which grant it is hereby declared is not extended to the states provided for in this act, and in lieu of any grant of saline lands to said states, the following grants of land are hereby made, to wit:

"To the state of South Dakota: For the school of mines, 40,000 acres; for the reform school, 40,000 acres; for the deaf and dumb asylum, 40,000 acres; for the agricultural college, 40,000 acres; for the university, 40,000 acres; for state normal schools, 80,000 acres; *for public buildings at the capital of said state, 50,000 acres,* and for such other educational and charitable purposes as the legislature of said state may determine, 170,000 acres; in all, 500,000 acres. [Emphasis added.]

"To the state of North Dakota a like quantity of land as is in this section granted to the State of South Dakota, and to be for like purposes, and in like proportion as far as practicable.

\*    \*    \*    \*    \*    \*

"That the states provided for in this act shall not be entitled to any further or other grants of land for any purpose than as expressly provided in this act. And the lands granted by this section shall be held, appropriated and disposed of exclusively for the purposes herein mentioned, in such manner as the legislatures of the respective states may severally provide." Enabling Act of 1889.

"Section 153. *All proceeds of the public lands that have heretofore been, or may hereafter be granted by the United States for the support of the common schools in this state; all such per centum as may be granted by the United States on the sale of public lands; the proceeds of property that shall fall to the state by escheat; the proceeds of all gifts and donations to the state for common schools, or not otherwise appropriated by the terms of the gift, and all other property otherwise acquired for common schools,* shall be and remain a perpetual fund for the maintenance of the common schools of the state. It shall be deemed a trust fund, the principal of which shall forever remain inviolate and may be increased but never diminished. The state shall make good all losses thereof." [Emphasis added.] Constitution of North Dakota.

Section 155. "After one year from the assembling of the first legislative assembly the *lands granted to the state from the United States for the support of the common schools, may be sold upon the following conditions and no other*: No more than one-fourth of all such lands shall be sold within the first five years after the same become salable by virtue of this section. No more than one-half of the remainder within ten years after the same become salable as aforesaid. The residue may be sold at any time after the expiration of said ten years. *The legislative assembly shall provide for the sale of all school lands subject to the provisions of this article. The coal lands of the state shall never be sold, but the legislative assembly may by general laws provide for leasing the same.* The words coal lands shall include lands bearing lignite coal." [Emphasis added.] Original section, Constitution of North Dakota.

"Section 159. *All land, money or other property donated, granted or received from the United States or any other source for a university, school of mines, reform school, agricultural college, deaf and dumb asylum, normal school or other educational or charitable institution or purpose,* and the proceeds of all such lands and other property so received from any source, shall be and remain perpetual funds, the interest and income of which, together with the rents of all such lands as may remain unsold shall be

inviolably appropriated and applied to the specific objects of the original grants or gifts. The principal of every such fund may be increased but shall never be diminished, and the interest and income only shall be used. Every such fund shall be deemed a trust fund held by the state, and the state shall make good all losses thereof." [Emphasis added.] Constitution of North Dakota.

"Section 164. *The legislative assembly shall have authority to provide by law for the sale or disposal of all public lands that have been heretofore, or may hereafter be granted by the United States to the state for purposes other than set forth and named in sections 153 and 159 of this article.* And the legislative assembly in providing for the appraisement, sale, rental and disposal of the same shall not be subject to the provisions and limitations of this article." [Emphasis added.] Constitution of North Dakota.

Under Section 10 of The Enabling Act, the State acquired for the support of common schools Sections numbered 16 and 36 in every township and certain other land in lieu of those sections when those sections had been sold or otherwise disposed of.

In Permann v. Knife River Coal Mining Company, 180 N.W.2d 146 (N.D.1970), the trial court in the instant case, acting as the trial court in that case, accepted as a fact what the parties seemed to have agreed to, that the land therein involved, being the north half of the same section involved in the instant case, was acquired for the support of common schools under the "in lieu of" provisions of Section 10 of The Enabling Act. In the instant case, the trial court concluded that the decision in *Permann* was based on a mistake of fact. It further concluded in the instant case that the land involved herein, and inferentially the entire section of land, was acquired by the State under Section 12 of The Enabling Act, for public buildings at the capital.

In *Permann* this court did not try the case anew, but accepted the findings of fact of the trial court. Mrs. Abbey now contends that the State is estopped from contending that the land in the instant case was acquired as something other than land for the support of the common schools, or "in lieu" land.

We do not agree. This lawsuit between different parties, involving different land and new facts, must be considered in light of the pertinent constitutional and statutory law. That *Permann* may have been decided on erroneous facts and without reference to certain provisions of the State Constitution and statutes is of no consequence in the determination of this case.

■ No decisions have been cited wherein the doctrine of estoppel has been applied by any court to circumstances such as exist in this case. We agree with the following view, expressed in 31 C.J.S., Estoppel, § 138, at 675, 676.

"Estoppels against the public are little favored. They should not be invoked except in rare and unusual circumstances, and may not be invoked where they would operate to defeat the effective operation of a policy adopted to protect the public. They must be applied with circumspection, and should be applied only in those special cases where the interests of justice clearly require it."

Consistent with this view is the position we took in Smith v. Anderson, 144 N.W.2d 530 (N.D.1966), when we held that the doctrine of estoppel could not be applied to defeat the rights of the public, for whom an action to quiet title to a public alley was brought. See Syllabus ¶ 3, Smith v. Anderson, *supra*, at 531.

What Mrs. Abbey seems to be contending is that since the State through its agency acted in a proprietary capacity in *Permann*, it cannot now in another lawsuit involving different parties and different property present facts and law inconsistent

with facts and law presented by it in *Permann*.

Such a contention is unreasonable. If it were the rule, it would lock in errors forever, to the detriment of the public, and result in unjust enrichment to the private litigant.

■ In an earlier part of Corpus Juris Secundum we note the following rule:

"To constitute an estoppel by reason of prior acts, claims, or conduct inconsistent with the right asserted, the essential elements of estoppel must exist. Mere inconsistency does not give rise to an estoppel, but it is the consequences of the inconsistency which create it.

"To constitute an estoppel, it is essential that the party charged therewith should have done, or refrained from doing, some act, or pursued some course of conduct, on which the estoppel may be based, and that in taking the former position he should have acted with knowledge of his rights, and have been aware of the facts in respect of the estoppel claimed. In addition, *it is essential that the party invoking the estoppel should have been misled by the acts or conduct of the party against whom the estoppel is claimed, that he changed his position in reliance thereon, and was justified in so doing, and that he was prejudiced thereby or that a benefit resulted to the party against whom the estoppel is claimed.*" [Emphasis added.] 31 C.J.S., Estoppel, § 108(b), at 554, 555, 556.

■ The elements of estoppel have not been proved in the instant case. Accordingly, we find no basis for applying the doctrine in this case.

■ We also reject Mrs. Abbey's contention that the doctrine of *stare decisis* applies in this case.

The doctrine has been stated as follows:

"Under the stare decisis rule, a principle of law which has become settled by a series of decisions generally is binding on the courts and should be followed in similar cases. * * *" 21 C.J.S., Courts, § 187, at 302.

In a 1942 decision our court, speaking through Judge Nuessle, said:

"The rule of stare decisis is a rule of policy grounded on the theory that when a legal principle is accepted and established, rights may accrue under it and security and certainty require that the principle be recognized and followed thereafter even though it later be found to be not legally sound. To a certain extent this is true. But *the rule is not sacrosanct.* Whether or not a holding shall be adhered to or modified or overruled, is a question within the discretion of the court under the circumstances of the case under consideration." [Emphasis added.] Otter Tail Power Co. v. Von Bank, 72 N.D. 497, 8 N.W.2d 599 at 607, 145 A.L.R. 1343 (1942).

As indicated by our action in Lembke v. Unke, 171 N.W.2d 837 (N.D.1969), we continue to share the view that this doctrine is not sacrosanct.

■ In any case, it is our view that this case may be distinguished from *Permann* and the other cases cited, upon the facts. Land for public buildings was not an issue in any of the cases cited. Accordingly, the doctrine of *stare decisis* does not apply.

Having concluded that the land involved in this lawsuit is land acquired by the State through Section 12 of The Enabling Act, we must now decide the effect of such a conclusion.

Mrs. Abbey contends that notwithstanding that it may be Section 12 land, although she disputes that it is, the prohibition against the sale of coal lands of the State contained in Section 155 of the Constitution of the State prohibits the sale of such lands and that once the State, through the Board of University and School Lands, has determined that land is not coal lands and has granted a patent to a

grantee, the State may not reserve coal and claim an interest in coal in the event that coal is ultimately discovered in the premises. In support thereof she cites Permann v. Knife River Coal Mining Company, 180 N.W.2d 146 (N.D.1970); Convis v. State, 104 N.W.2d 1 (N.D.1960); and State v. Oster, 61 N.W.2d 276 (N.D.1953).

██ In response to this argument, the State asserts that in applying the doctrine of *"ejusdem generis"* that part of Section 155 of the Constitution as originally enacted, which provides that the coal lands of the State shall never be sold, must be construed to relate only to common-school land, as all of the preceding part of Section 155 relates to common-school land.

"The doctrine of ejusdem generis, by which general words in a statute following particular words are presumed to relate only to things of the same kind or class as the particular words, is applicable to the construction of constitutional provisions; * * *" 16 C.J.S. Constitutional Law § 22, p. 90.

Mrs. Abbey, on the other hand, refers us to the balance of the paragraph from C.J.S., to the effect that this doctrine is only a rule of construction to aid in arriving at the intent of the instrument, and must not be applied to thwart that intent, and to the general rule of construction that a constitution should be construed as a whole and effect given to every part if possible. See 16 C.J.S. Constitutional Law § 22, "Doctrine of Ejusdem Generis", and § 23, "Instrument Construed as a Whole", at page 91.

Mrs. Abbey also refers us to the Debates of the North Dakota Constitutional Convention of 1889. From an examination of the official report of the proceedings and debates of the First Constitutional Convention of North Dakota, as recorded by R. M. Tuttle, we note that while the then designated Section 159, which later became Section 155, was under consideration, Delegate Williams moved to amend the Section by adding the following language: "The coal lands of the state shall never be sold, but the legislative assembly may by general laws provide for leasing the same." Following that motion, he is reported to have made the following statement:

"At the present time these coal lands are regarded as not possessing any great value, but it is a fact that they are being bought up by syndicates, and as a matter of looking to the future I think it would be well to reserve these lands from sale in order to protect the fuel supply, and allow the State of the future to lease them. It seems to me under such rules and regulations as the Legislature may prescribe, it would ·be wise to protect these lands and allow the title to remain in the State."

The Debates further disclose that thereafter the Williams amendment was adopted and the section was adopted as amended.

██ It is our view, in light of the fact that this discussion took place in conjunction with an amendment to Section 155, which related only to school land, that it was not intended to apply to public-building land granted by the United States to the State of North Dakota. This view is also supported by the fact that Section 164 of the State Constitution grants authority to the Legislative Assembly to provide by law for the sale of public lands granted by the United States for purposes other than those set forth in Sections 153 and 159 of Article IX. It will be noted that neither Section 153 nor 159 contains reference to lands granted to the State for public buildings. It is also significant that the last sentence of Section 164 of the State Constitution authorizes the Legislative Assembly to provide for the sale of such land free of the limitations contained in that Article. Since Section 155 of the State Constitution is a part of Article IX of the State Constitution, the Legislative Assembly is permitted to make provision for the sale of other land free from that limitation. Land for public buildings is land other than that described in Sections 153 and 159, and accordingly is not subject to

the provision contained in Section 155 prohibiting the sale of coal lands.

We believe that there is a difference between "coal lands" and "coal" and that, although under Section 155 of the State Constitution as it read originally "coal" in "coal lands" could not be reserved, "coal" in land not subject to Section 155 could be sold and could be reserved as the Legislature deemed proper, pursuant to Section 164 of the State Constitution.

As a result of the amendment to Section 155, made in 1960, it will be noted that all land granted to the State for the support of common schools may now be sold, but that the sale must now be made subject to a reservation of all minerals, including coal.

The next question which arises is whether the Legislature has made other provisions for the sale of land acquired for public buildings under Sections 12 and 17 of The Enabling Act. We believe so.

The patents to the South Half of Section 12, the land involved in this lawsuit, were issued to Mrs. Abbey's predecessor, Chas. Herman, on the 22nd day of January 1948. At that time, Section 15–0701 of the Revised Code of 1943 read:

"The terms 'other than original grant lands' or 'nongrant lands' shall mean all lands obtained by the board of university and school lands in any manner other than that described in section 15–0601."

Pertinent then is the language of Section 15–0601 of the Revised Code of 1943, which reads:

" 'Original Grant Lands' Defined. The term 'original grant lands' shall mean all of the public lands which heretofore have been or hereafter may be granted to the state by the United States for the support and maintenance of the common schools or for the support and maintenance of the university, the school of mines, the state training school, the agricultural college, the school for the

deaf and dumb, any normal school, or any other educational, penal, or charitable institution, and any lands which have been obtained by the state through a trade of any such lands for other lands. * * * "

It is obvious from reading Section 15–0601 that public-building lands are not included within it, and thus it follows that such lands acquired either under Section 12 or Section 17 of The Enabling Act are governed by Chapter 15–07 of the North Dakota Revised Code of 1943.

Our attention is drawn to Section 15–0620 of the Revised Code of 1943, which reads:

"Coal Lands Not to Be Sold But May Be Leased. The coal lands of the state shall not be sold, but such land may be leased under the provisions of any law governing such leases. The words 'coal lands' include lands bearing lignite coal."

It is our view that Section 15–0620, since it is contained under Chapter 15–06, entitled "Sale of Original Grant Lands", in the Revised Code of 1943, relates only to lands as encompassed and defined in Section 15–0601, North Dakota Revised Code of 1943.

Section 15–0703, North Dakota Revised Code of 1943, provides that the Board of University and School Lands may sell non-grant land at either private or public sale, as provided in that chapter, and other sections of Chapter 15–07 provide for the method and conditions of sale under that chapter, that chapter being denominated in the Revised Code of 1943 as "Sale and Lease of Nongrant Lands".

We must next determine whether the reservation contained in the patents to Mr. Herman, Mrs. Abbey's predecessor in interest, and the language of Section 38–0901, North Dakota Revised Code of 1943, effectively reserve to the State fifty percent of the coal in and under the premises involved in this lawsuit.

The reservations contained in the patents to Mr. Herman read:

"[R]eserving and excepting from the operation of this grant all rights and privileges vested in the State of North Dakota under the provisions of the constitution and laws of said state."

Section 38–0901, North Dakota Revised Code of 1943, reads:

"Interest in Oil, Gas, and Mineral Rights to Be Reserved on Transfer of State Lands. In every transfer of land, whether by deed, contract, lease, or otherwise, by the state of North Dakota, or by any department thereof, *fifty percent of all oil, natural gas, or minerals which may be found on or underlying such land shall be reserved to the state of North Dakota.* Any deed, contract, lease, or other transfer of any such land made after February 20, 1941, which does not contain such reservation shall be construed as if such reservation were contained therein. The provisions of this section shall apply to all lands owned by this state or by any department thereof regardless of how title thereto was acquired." [Emphasis added.] N.D.R.C. 1943.

Mrs. Abbey contends that the reservation contained in the patents is too vague to constitute any kind of reservation and that in addition coal is not a mineral.

As to the first contention, that it is too vague to constitute a reservation, we think that the reservation was sufficient to alert the purchaser to the fact that he was acquiring only what the Constitution and the laws of the State permitted. At that time, Section 38–0901, N.D.R.C.1943, required the State and any department thereof to reserve fifty percent of all oil, natural gas, and minerals in land being transferred. It went on to say that any deed, contract, lease, or other transfer of such land made after February 20, 1941, which did not contain such reservation should be construed as if such reservation were contained therein.

We think, therefore, that the language contained in the patents was sufficient to alert the purchaser, notwithstanding it would have been a much better practice had the department actually reserved fifty percent of the minerals in the patent itself.

Next let us consider Mrs. Abbey's contention that coal is not a mineral. She contends that whether coal is a mineral is a question of fact and not a question of law and that, therefore, evidence is required to establish that fact. With this contention we do not agree. It is our view that whether a substance is of an organic or inorganic nature is immaterial in determining whether it is a mineral for the purposes of this statute.

Precedent for this view may be found in Adams County v. Smith, 74 N.D. 621, 23 N.W.2d 873 (1946).

In that case, the question arose over the meaning of the word "minerals" in conjunction with the reservation required to be included in county transfers. The pertinent part of that section reads:

"11–2704. Reservation of Mineral Rights. Upon the sale of any lands by the county, whether such lands were acquired by tax proceedings, deed, quitclaim deed, or by any other method and whether such lands are transferred by the county by deed, contract, or lease, there shall be reserved to the county transferring each tract of land fifty percent of all oil, natural gas, or minerals which may be found on or underlying the land. Any transfer, deed, or lease which does not contain such reservation shall be construed as if such reservation were contained therein. * * *" N. D.R.C.1943.

Judge Morris, in speaking for the court and in concluding that the word "mineral" included coal, said:

"The first question to be determined is whether the word 'mineral' as used in

the statute may be said to include coal. The statute attempts to impress a mineral reservation upon conveyances of land made by counties. It is proper, therefore, to consider the meaning given by the courts to the term 'mineral' in conveyances and reservations. The meaning and scope of this term has come before the courts in many cases. See Annotations, 17 A.L.R. 156, and 86 A.L.R. 983. These cases disclose that the word 'mineral' is not a definite term susceptible to a rigid definition applicable in all instances. It is a term susceptible of limitations or extensions according to the intention with which it is used. United States v. Harris, 5 Cir., 115 F.2d 343; Puget Mill Co. v. Duecy, 1 Wash.2d 421, 96 P.2d 571; Kalberer v. Grassham, 282 Ky. 430, 138 S.W.2d 940; Rock House Fork Land Co. v. Raleigh Brick & Tile Co., 83 W.Va. 20, 97 S.E. 684, 17 A.L.R. 144; Thompson on Real Property, Perm.Ed., Sec. 86. The North Dakota Legislature in Ch. 304, Sess. Laws, N.D.1911, Sec. 5518, Comp.Laws N.D.1913, in connection with reservations in deeds and transfers of real property referred to 'coal or other mineral deposits' indicating a legislative intent to consider coal as a mineral. This legislative construction is given added significance by the fact that Sec. 5518 was amended by Ch. 268, Sess. Laws N.D. 1941, and thus came to the special attention of the same legislative assembly that enacted Ch. 136, Sess. Laws N.D. 1941, the statute we are now construing.

"We have found no cases holding that coal is not a mineral. Wherever the question has been considered the courts have construed the term 'mineral' to include coal. Henry v. Lowe, 73 Mo. 96; Williams v. South Penn Oil Co., 52 W. Va. 181, 43 S.E. 214, 60 L.R.A. 795; Murray v. Allred, 100 Tenn. 100, 43 S. W. 355, 39 L.R.A. 249, 66 Am.St.Rep. 740; McCombs v. Stephenson, 154 Ala. 109, 44 So. 867. We, therefore, reach the conclusion that the term 'mineral', as used in Ch. 136, Sess. Laws N.D. 1941, includes coal." Adams County v. Smith, *supra,* 23 N.W.2d 873, 875.

■ Applying that reasoning to the instant case, we conclude that the Legislature in Section 38–0901, N.D.R.C.1943, intended that the word "minerals" include coal.

Although we have not specifically discussed herein all of the eleven specifications of error and the eighteen assignments of error and all the arguments made in conjunction with each, we have considered them. We conclude that they are without merit. Accordingly, the judgment of the trial court is affirmed.

STRUTZ, C. J., and PAULSON, KNUDSON and TEIGEN, JJ., concur.